UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| DR. JOSEPH F. KASPER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AAC HOLDINGS, INC., JERROD N. MENZ, MICHAEL T. CARTWRIGHT AND KATHRYN SEVIER-PHILLIPS,<br><br>Defendants. | No. _____<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

## I.    INTRODUCTION

1.    Plaintiff, Dr. Joseph F. Kasper, ("Plaintiff"), by his undersigned attorneys, alleges as follows upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of Defendants' public documents, filings made with the United States Securities and Exchange Commission (the "SEC"), announcements issued by AAC Holdings, Inc. ("AAC" or the "Company"), wire and press releases published by and regarding the Company and other information readily obtainable in the public domain.

## II.    NATURE OF THE ACTION

2.    This is a federal securities class action on behalf of all investors who purchased or otherwise acquired AAC common stock between October 2, 2014, through August 3, 2015, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15

U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

3. AAC operates treatment facilities which provide inpatient substance abuse treatment for individuals with drug and alcohol addiction. AAC operates treatment facilities throughout the United States.

4. On October 1, 2014 AAC went public by selling 5 million shares of its common stock to public investors at a price of $15 per share. The stock began to trade on the New York Stock Exchange ("NYSE") on October 2, 2014. In its Form S-1 Registration Statement declared effective by the SEC on October 1, 2015 (the "S-1"), AAC disclosed that it was "*not aware of any legal proceedings the ultimate outcome of which*, in our judgment based on information currently available, *would have a material adverse effect on our business, financial condition or results of operations.*"[1] AAC also disclosed that it is dependent on its senior management and that if any of them departed from the Company, it could have an adverse impact on the Company and its operations. Additionally, AAC disclosed that if it treatment centers in California, Nevada and Texas were closed, it would have a material adverse impact on the Company.

5. Known to, but undisclosed by Defendants, was that the California Department of Justice was investigating the death of a patient at AAC's Forterus treatment facilities in California. Specifically, a grand jury was impanelled to investigate AAC President Jerrod N. Menz ("Menz"), a then current Company employee, and three former employees and the California subsidiary for wrongful death. Indeed, in civil litigation involving the death of the patient, Gary Benefield, a California Assistant Attorney General filed an affidavit, prior to AAC's IPO, stating that he believed murder indictments would be handed down. Menz and AAC were both named defendants in the civil litigation involving Mr. Benefield's death.

---

[1] Unless otherwise noted, all emphasis has been added by counsel.

6.      On July 29, 2015 after the close of trading on the stock market, AAC reported that a grand jury in California returned an indictment asserting "charges against subsidiaries of AAC and two current and three former employees." AAC itself did not reveal in its press release that the charges were second-degree murder and dependent adult abuse. AAC noted that Menz, who was also indicted, voluntarily stepped down as President of AAC. AAC also reported better than expected financial results for its 2015 second quarter. On July 30, 3015 AAC's stock price declined by $1.58 per share, or 4% on these disclosures.

7.      On August 3, 2015, AAC filed its Form 10-Q in which it commented on the indictments. In the 10-Q AAC revealed that the indictments were for second-degree murder and dependent adult abuse. Stock market analysts also began to issue reports as to "How Murder Charges Could Hurt AAC Holdings." www.TheStreet.com. AAC's stock price fell again on August 3, 2015, declining $5.22 per share, or 14%. Then, on August 4, 2015, Bleeker Street Research ("Bleeker") published a report entitled "Even More Undisclosed Deaths And The Start Of Real Problems" at AAC. Bleeker reported that AAC "continues to deceive patients, investors and analysts about the extent of and details of patient deaths;" "At least 8 undisclosed patient deaths in California and Florida, as recent as 2014;" and "Ongoing pattern of illegal behavior led to patient deaths, and continues now despite patient deaths." AAC's common stock price plunged in reaction to this news, falling by $12.90 per share, or 39%. All totaled, since AAC disclosed that charges were being brought against Menz and its California subsidiaries, AAC's common stock price fell by $19.18 per share, or 49%, wiping out $153 million in market capitalization.

3

Case 3:15-cv-00923   Document 1   Filed 08/24/15   Page 3 of 18 PageID #: 3

## III. JURISDICTION AND VENUE

8. The claims herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as AAC has its principal executive offices located in this District and conducts substantial business therein.

11. In connection with the acts, omissions, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## IV. PARTIES

12. Plaintiff, as set forth in the attached Certification, acquired AAC securities at artificially inflated prices during the Class Period and has been damaged by the revelation of AAC's material misrepresentations and material omissions.

13. Defendant AAC provides substance abuse treatment services for individuals with drug and alcohol addition. It also provides treatment services for individuals struggling with behavioral health disorders. AAC, through its subsidiaries, operated seven residential substance abuse treatment facilities, five standalone outpatient centers and one facility for overeating-related behavioral disorders. AAC is incorporated under the laws of Nevada and its principle executive offices are located at 115 East Park Drive, 2nd Floor, Brentwood, TN, 37027. The

4

Case 3:15-cv-00923   Document 1   Filed 08/24/15   Page 4 of 18 PageID #: 4

Company's common shares trade on the NYSE under the trading symbol AAC and, as of July 24, 2015, AAC had 22,409,311 outstanding shares of common stock.

14. Defendant Michael T. Cartwright ("Cartwright") is the Company's Chairman and Chief Executive Officer ("CEO"). Cartwright has served as Board Chair since 2011 and CEO since June 2013.

15. Defendant Jerrod N. Menz ("Menz") was the President and member of the Board of Directors of AAC until his indictment for murder. Menz was CEO of Forterus from 2011 to 2013 and was Vice President and Secretary of Forterus from 2009 to 2011. Menz remains an employee of AAC.

16. Defendant Kathryn Sevier Phillips ("Phillips") is the Secretary/General Counsel of AAC. Phillips joined AAC as General Counsel and Secretary in 2013.

17. The defendants referenced above in ¶¶14-16 are sometimes collectively referred to herein as the "Individual Defendants."

18. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content and form of AAC's Registration Statement, annual reports, quarterly reports, press releases and presentations to: the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. They were provided with copies of the SEC filings alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the

5

positive representations being made were materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## V. SUBSTANTIVE ALLEGATIONS

19. AAC sold 5 million shares of common stock to public investors pursuant to its initial public offering ("IPO") on October 1, 2014 at $15 per share. Shares were sold pursuant to the S-1 and accompanying prospectus and began to trade on October 2, 2014. AAC described itself as "a leading provider of inpatient substance abuse treatment services for individuals with drug and alcohol addiction. As of August 31, 2014, we operated six substance abuse treatment facilities located throughout the United States, focused on delivering effective clinical care and treatment solutions across our 467 beds, which included 338 licensed detoxification beds. In addition, we have three facilities under development and an additional property under contract that we plan to develop into a new facility." S-1 at 1.

20. Among others, AAC disclosed the following as risks related to its business:

- We rely on our multi-faceted sales and marketing program to continuously attract and enroll clients to our network of facilities. Any disruption in our national sales and marketing program would have a material adverse effect on our business, financial condition and results of operations.

- We will need additional financing to execute our business plan and fund operations, which additional financing may not be available on reasonable terms or at all.

- If we fail to comply with the extensive laws and government regulations impacting our industry, we could suffer penalties, be the subject of federal and state investigations and potential claims and legal actions by clients, employees and others or be required to make significant changes to our operations, which may reduce our revenues, increase our costs and have a material adverse effect on our business, financial condition and results of operations.

6

21. The S-1 also stated that "[w]e derive a significant portion of our revenues from three treatment facilities located in California, Nevada and Texas. These treatment facilities accounted for 76.5% of our total revenues in 2013 and 81.5% for the six months ended June 30, 2014. . . . If any event occurs that would result in a complete or partial shutdown of any of these facilities ... such event could lead to decreased revenues and/or higher operating costs, which could have a material adverse effect on our revenues, profitability and cash flows." S-1 at 15.

22. The S-1 disclosed that "We believe our national sales and marketing program provides us with a competitive advantage compared to treatment facilities that primarily target local geographic areas and use fewer marketing channels to attract clients. If any disruption occurs in our national sales and marketing program for any reason or if we are unable to effectively attract and enroll new clients to our network of facilities, our ability to maintain census could be adversely affected, which would have a material adverse effect on our business, financial condition and results of operations." S-1 at 15.

23. The S-1 also disclosed that "Our Second Amended and Restated Credit Facility (the "Credit Facility") imposes restrictions that could impede our ability to enter into certain corporate transactions, as well as increases our vulnerability to adverse economic and industry conditions, by limiting our flexibility in planning for, and reacting to, changes in our business and industry. . . . In addition, our Credit Facility requires us to meet certain financial covenants. The restrictions may prevent us from taking actions that we believe would be in the best interests of our business and may make it difficult for us to successfully execute our business strategy or effectively compete with companies that are not similarly restricted. . . . The breach of any of these covenants or restrictions could result in a default under the Credit Facility, which could result in the acceleration of our debt. In the event of an acceleration of debt, we could be forced

7

to apply all available cash flows to repay such debt and could be forced into bankruptcy or liquidation."

24. The S-1 further disclosed "*As a provider of treatment services, we are subject to governmental investigations and potential claims and legal actions by clients, employees and others, which may increase our costs and have a material adverse effect on our business, financial condition and results of operations.* Given the addiction and mental health of clients and the services provided, the substance abuse treatment industry is heavily regulated by governmental agencies and involves significant risk of liability. We and others in our industry are exposed to the risk of governmental investigations and lawsuits or other claims against us and our physicians and professionals arising out of our day to day business operations, including, without limitation, client treatment at our facilities and relationships with healthcare providers that may refer clients to us. Addressing any investigations, lawsuits or other claims may distract management and divert resources." S-1 at 20-21.

25. The S-1 represented that "The expertise and efforts of our key executives, including our chief executive officer, president, chief operating officer, chief financial officer and general counsel, and other key members of our facility management personnel and sales staff are critical to the success of our business. We do not currently have employment agreements or non-competition covenants with any of our key executives. The loss of the services of one or more of our key executives or of a significant portion of our facility management personnel or sales staff could significantly undermine our management expertise and our ability to provide efficient, quality healthcare services at our facilities. Furthermore, if one or more of our key executives were to terminate employment with us and engage in a competing business, we would

8

be subject to increased competition, which could have a material adverse effect on our business, financial condition and results of operations." S-1 at 23.

26. Under "Legal Proceedings" AAC disclosed that "From time to time, we may be engaged in various lawsuits and legal proceedings in the ordinary course of our business. Except as described below, *we are currently not aware of any legal proceedings the ultimate outcome of which*, in our judgment based on information currently available, *would have a material adverse effect on our business, financial condition or results of operations.*" Although AAC disclosed certain pending litigation, one in which AAC sued Dr. James Bevell for "breach of contract and tortious interference with business practices arising out of Mr. Bevell's breach of his non-compete agreements." AAC made no disclosure of the pending grand jury investigation of Menz or Forterus.

27. The statements identified in paragraphs 20 through 26 above, were materially false and misleading when made, and omitted from disclosure material facts necessary to not make the statements made misleading. At the time these statements were made, Menz, Cartwright and Phillips either knew, or recklessly disregarded, that a grand jury was impanelled by the California Department of Justice to determine whether Menz and Forterus should be indicted for murder. Defendants omitted this material fact from disclosure which was necessary to make the statements made in paragraphs 20 to 26 not misleading.

28. On November 12, 2014 AAC filed its Form 10-Q with the SEC in which it again represented that "we are currently not aware of any legal proceedings the ultimate outcome of which, in our judgment based on information currently available, would have a material adverse effect on our business, financial condition or results of operations." 10-Q at 40.

9

29. In its Form 10-K, for its fiscal year ending 2014, and filed with the SEC on March 11, 2015, AAC again represented that ""we are currently not aware of any legal proceedings the ultimate outcome of which, in our judgment based on information currently available, would have a material adverse effect on our business, financial condition or results of operations." 10-K at 32.

30. On May 5, 2015 AAC filed its Form 10-Q with the SEC for its 2015 first quarter results in which it again represented that "we are currently not aware of any legal proceedings the ultimate outcome of which, in our judgment based on information currently available, would have a material adverse effect on our business, financial condition or results of operations." 10-Q at 36.

***The Truth Begins to Emerge***

31. On July 29, 2015 after the close of trading, AAC issued a press release disclosing that a grand jury in California indicted Menz, Forterus, ABTCC, a current employee and three former AAC employees.[2] AAC indicated that it takes "these charges seriously" but that it believed the case to be "without merit."

32. Also, on July 29, 2015 AAC reported its 2015 second quarter financial results reporting an increase in revenues by 85%, an increase in earnings per diluted share by 767%, an increase in client admissions by 62% among other positive financial developments. AAC's earnings per share results beat analysts' estimates by almost double.

33. On August 3, 2015, in its Form 10-Q filed with the SEC that same day, AAC disclosed that Menz, Forterus, ABTTC and three former employees were indicted for second-degree murder and dependent adult abuse. After stating that it believed the allegations "are

---

[2] ABTCC stands for A Better Tomorrow Treatment Centers, a unit of AAC Holdings.

10

Case 3:15-cv-00923   Document 1   Filed 08/24/15   Page 10 of 18 PageID #: 10

legally and factually unfounded" AAC conceded that "if the defendants were to be convicted, however, the loss could be material." 10-Q at 23.

34. The 10-Q continued that "Defending ourselves against the indictment could potentially entail costs that are material and could require significant attention from our management. If the defendants were to be convicted of the crimes alleged in the indictment, potential penalties could include fines, restitution, conditions of probation and other remedies. . . . Regardless of the outcome of the indictment, the publicity and potential risks associated with the indictment could negatively impact the perception of our Company by clients, investors and others. The consequences of the current criminal proceeding, as well as consequences of any future governmental investigation or lawsuit of any related or unrelated matter, could have a material adverse effect on our business and results of operations." 10-Q at 41.

35. Also, on August 3, 2015 The Street.com issued a report entitled "How Murder Charges Could Hurt AAC Holdings."

36. On the morning of August 4, 2015 the website, Seeking Alpha, published a report by Bleeker. In addition to the death of Benefield, for which Menz etc. . . were indicted, Bleeker reported of seven additional deaths at other AAC treatment facilities in California and Florida as recently as 2014. Bleeker stated that AAC has known about the possibility of criminal charges as an assistant California Attorney General filed an affidavit in the Benefield civil action in 2013 that "criminal charges will be filed." Menz, Forterus and AAC were named defendants in the Benefield civil action.

37. AAC's stock plunged on August 4, 2015 after the revelation of the facts contained in the Bleeker report, falling by $12.90 per share, or 39%.

### VI. CLASS ACTION ALLEGATIONS

11

38. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired AAC common stock between October 2, 2014, and August 3, 2015, inclusive. Excluded from the Class are Defendants, directors, and officers of AAC, as well as their families and affiliates.

39. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

40. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    1. Whether the Exchange Act was violated by Defendants;

    2. Whether Defendants omitted and/or misrepresented material facts;

    3. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    4. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    5. Whether the price of AAC common stock was artificially inflated; and

    6. The extent of damage sustained by Class members and the appropriate measure of damages.

41. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

12

Case 3:15-cv-00923 Document 1 Filed 08/24/15 Page 12 of 18 PageID #: 12

42. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

43. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

44. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

   1. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   2. The omissions and misrepresentations were material;

   3. The Company's common stock traded in efficient markets;

   4. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

   5. Plaintiff and other members of the Class purchased AAC common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

   6. At all relevant times, the markets for AAC common stock were efficient for the following reasons, among others: (i) AAC filed periodic public reports with the SEC; and (ii) AAC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting

13

services. Plaintiff and the Class relied on the price of AAC common stock, which reflected all the information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

45. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

46. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

47. On July 29, 2015, after the close of the markets, AAC disclosed that "the indictment asserts charges against subsidiaries of AAC and two current and three former employees." Tellingly, AAC fails to disclose that the indictment was for murder in the second degree and dependent adult abuse. On July 30, 2015 AAC's stock price declined by $1.58 per share, or 4% on these disclosures. On August 3, 2015 AAC filed its Form 10-Q with the SEC in which it disclosed that Menz, Forterus, ABTCC, a current employee and three former employees were indicted by a grand jury in California for murder in the second degree and dependent adult abuse. AAC's common stock price declined on August 3, 2015 by $5.22 per share, or 14%. Finally, on August 4, 2015 the Bleeker report was published which, among other things, revealed seven additional deaths at AAC facilities in California and Florida and AAC's stock price plunged by $12.90 per share, or 39%. These declines are directly attributable to the revelations of the second-degree murder charges and additional deaths at other AAC facilities.

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

48. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired AAC securities during the Class Period.

51. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AAC common stock. Plaintiff and the Class would not have purchased AAC common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## SECOND CLAIM
**Violation of Section 20(a) of the Exchange Act
(Against Individual Defendants)**

52. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

15

53. The Individual Defendants acted as controlling persons of AAC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent AAC from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the fraudulent SEC filings and other reports alleged by Plaintiff to be misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of these materials or cause them to be corrected so as not to be misleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

1. Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class Classes as defined herein, and a certification of Plaintiff as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

2. Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount proven at trial, including pre-judgment and post-judgment interest thereon;

3. Awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4. Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

DATED: August 24, 2015

                Respectfully Submitted,

**BRAMLETT LAW OFFICES**
By:

*s/Paul Kent Bramlett*
**PAUL KENT BRAMLETT**
TN SUP CT #7387/MS SUP CT #4291
**ROBERT PRESTON BRAMLETT**
TN SUP CT #25895
40 Burton Hills Blvd., Suite 200
P. O. Box 150734
Nashville, TN 37215
Telephone:   615.248.2828
PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

**BLOCK & LEVITON LLP**
Jeffrey C. Block
Steven P. Harte
155 Federal Street, Suite 400
Boston, Massachusetts 02110
Tel: (617) 398-5600\
Fax: (617) 507-6020
Jeff@blockesq.com
Steven@blockesq.com

                *Counsel for Plaintiff*

17

Case 3:15-cv-00923   Document 1   Filed 08/24/15   Page 17 of 18 PageID #: 17

## PLAINTIFF'S CERTIFICATION OF SECURITIES
## FRAUD CLASS ACTION COMPLAINT

1.  I, Joseph F. Kasper MD, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

2.  I did not purchase these securities at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

3.  My transactions in AAC Holdings, Inc. ("AAC") securities during the Class Period are as follows:

| DATE | TRANSACTION (buy or sell) | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 08/03/2015 | Bought | 370 | $32.79 |
| 08/04/2015 | Bought | 370 | $29.47 |
| 08/04/2015 | **Bought | 740 | $23.20 |
| | ** NOTE this transaction attempted to cancel and could not since | | |
| | Trading was stopped and when it reopened was unable to | | |
| | cancel fast enough before brokerage had executed. | | |
| | | | |

4.  During the three-year period preceding the date of my signing this Certification, I have never sought to be appointed nor have I ever been appointed as lead plaintiff or class representative in any class action arising under the securities laws of the United States.

5.  I have reviewed the facts and allegations against AAC (NYSE: AAC).

6.  I am willing to serve as a representative party on behalf of the class in this action, including providing testimony at deposition and trial, if necessary.

7.  I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered or approved by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

Signed under the penalties of perjury this 20 day of August, 2015.

_____ MD
Joseph F. Kasper MD