UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DR. JOSEPH F. KASPER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AAC HOLDINGS, INC., JERROD N. MENZ, MICHAEL T. CARTWRIGHT, ANDREW W. MCWILLIAMS AND KIRK R. MANZ<br><br>Defendants. | No. 3:15-cv-00923<br>(**Consolidated**)<br><br>JUDGE CAMPBELL<br>MAGISTRATE JUDGE BRYANT<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATION OF FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. PRELIMINARY STATEMENT ..... 2

A. Summary and Overview of the Action ..... 2

B. Defendants' Class Period Misrepresentations and Material Omissions Were Made with Scienter ..... 5

C. The Truth Emerges ..... 10

III. JURISDICTION AND VENUE ..... 12

IV. PARTIES ..... 13

A. Lead Plaintiffs ..... 13

B. Defendants ..... 13

V. VIOLATIONS OF THE EXCHANGE ACT ..... 21

A. Company and Regulatory Background ..... 21

1. The Addiction Business ..... 21

2. AAC's Checkered Past ..... 22

3. The Alleged Murder of Mr. Benefield and the *Benefield* Litigation ..... 25

4. The Insider Defendants Consummate the IPO ..... 33

B. Defendants' Growth-by-Acquisition Strategy ..... 35

C. The Company's Class Period Acquisitions ..... 37

D. Defendants' Materially False and Misleading Class Period Statements and Omissions ..... 39

1. The Registration Statement Contains Actionable Misleading Statements and Omissions ..... 39

2. The Company's 4Q 2014 Quarterly Report Contains Actionable Misleading Statements and Omissions ..... 44

3. The Company's 2014 Annual Report Contains Actionable Misleading Statements and Omissions ..... 44

4. The Company's 1Q 2015 Quarterly Report Contains Actionable Misleading Statements and Omissions ..... 49

5. Defendants Cartwright and Manz Made Knowingly False Representations about AAC's Internal Controls ..... 49

VI. LOSS CAUSATION ..... 51

A. July 29, 2015 Disclosure Events ..... 52

B. August 1, 2015 Disclosure Event ..... 53

C. August 3, 2015 Disclosure Events ..... 54

VII. RELEVANT POST CLASS PERIOD EVENTS ..... 59

VIII. CLASS ACTION ALLEGATIONS ..... 61

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE ..... 63

X. NO SAFE HARBOR ..... 64

XI. PRAYER FOR RELIEF ..... 67

XII. JURY DEMAND ..... 67

“*I’m untouchable*.”
Former AAC Holdings, Inc. President
Jerrod N. Menz[1]

## I. NATURE OF THE ACTION

1. This is a putative class action for violation of the federal securities laws. Lead Plaintiffs, Arkansas Teacher Retirement System (“ATRS”) and Dr. James P. Gills (“Dr. Gills”), collectively referred to as “Plaintiffs,” by and through their undersigned counsel, bring this action pursuant to the Securities Exchange Act of 1934 (the “Exchange Act”).

2. Plaintiffs’ claims are brought on behalf of all persons who purchased or otherwise acquired the publicly-traded securities of AAC Holdings, Inc. (“AAC” or the “Company”) between October 2, 2014 and August 3, 2015, inclusive (the “Class Period”), and were damaged by the conduct asserted herein (the “Class”). Plaintiffs assert violations of Sections 10(b) and 20(a) of the Exchange Act, and Securities and Exchange Commission (“SEC”) Rule 10b-5(b) promulgated thereunder. Defendants are (i) AAC; (ii) AAC Chairman and Chief Executive Officer (“CEO”) Michael T. Cartwright (“Cartwright”); (iii) AAC Chief Financial Officer (“CFO”) Kirk R. Manz (“Manz”); (iv) former AAC President and Director Jerrod N. Menz (“Menz”); and (v) Chief Accounting Officer Andrew W. McWilliams (“McWilliams”) (together, the individual defendants are referred to as the “Insider Defendants”). The Insider Defendants were at all relevant times described in the Company’s filings with the SEC as its “Executive Officers.”

---

[1] Declaration of Thalia Kirchwehn in Support of Plaintiff’s Opposition to Defendant Noreen Bumby’s D.O.’s Motion for Summary Judgment, ¶ 19, *Benefield v. ABTTC, Inc., Menz, et al.*, No. RIC 1112376 (Cal. Super. Ct., Riverside Cnty. filed Mar. 5, 2014).

3. Plaintiffs' allegations are based upon Lead Counsel's investigation, except as to the allegations specifically pertaining to Plaintiffs, which are based upon their personal knowledge. Lead Counsel's investigation included, among other things, a review of: (i) AAC's public filings with the SEC; (ii) press releases and other public statements made by AAC and the Insider Defendants; (iii) analyst, media, civil and criminal filings, reports, deposition transcripts, grand jury testimony and sworn declarations submitted by current and former AAC employees, a California Deputy Attorney General, Defendants Menz and Cartwright and their respective counsel in, *inter alia*, *People of the State of Cal. v. McCausland, Menz*, *Forterus, Inc.*, *et al*., No. SWF 1501351 (Cal. Super. Ct., Riverside Cnty.) and *Benefield v. ABTTC, Inc., Menz*, *et al.*, No. RIC 1112376 (Cal. Super. Ct., Riverside Cnty.) (hereinafter, the "*Benefield* Litigation"); (iv) publicly-available trading data; and (v) documents and information obtained from third parties. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II. PRELIMINARY STATEMENT

### A. Summary and Overview of the Action

4. AAC provides inpatient substance abuse treatment for individuals with drug and alcohol addiction. The Company wins patients through aggressive marketing campaigns on television, the internet and elsewhere to "convert" callers into its intake centers into revenue-generating residents at its treatment facilities. The Company went public on October 1, 2014 by offering shares of its common stock to investors in an initial public offering set at $15 per share ("IPO"). William Blair & Company, L.L.C. ("William Blair"), Avondale Partners, LLC and Raymond James Financial, Inc. acted as underwriters for the IPO.

AAC's stock began trading on the New York Stock Exchange ("NYSE") on October 2, 2014. Net proceeds to the Company from the IPO were nearly $70 million.

5. The IPO was a resounding success. On AAC's first day of trading, the Company's shares closed sharply higher at $18.50 per share. Defendants' offering materials had successfully portrayed AAC as an emerging industry leader with a national brand and a deep, experienced management team. An October 27, 2014 research report by William Blair relayed, for instance, that AAC "appears focused on becoming the center of excellence for substance abuse treatment in the United States," and described how Defendants Cartwright and Menz would "prove to be strong stewards of long-term shareholder value creation." On July 2, 2015, the same day the Company announced two corporate acquisitions using shares of AAC's common stock as alleged in ¶¶19, 96-97, *infra*, the Company's share price had reached its Class Period trading high of $44.75 per share.

6. As alleged throughout herein, however, AAC's success as a publicly-traded Company was the result of an undisclosed fraudulent scheme to deceive investors about an active criminal investigation by the California Department of Justice ("DOJ") of Defendant Menz and AAC's largest and most profitable subsidiaries.[2] The California DOJ's investigation ultimately materialized into an indictment against Defendant Menz, the AAC Affiliates and others for, *inter alia*, second-degree murder of an AAC patient named Gary Benefield. While the facts surrounding Mr. Benefield's alleged abuse and murder at an

[2] These entities include ABTTC, Inc. d/b/a "A Better Tomorrow Treatment Centers," Forterus, Inc. and Forterus Health Care Services, Inc. (collectively hereinafter, the "AAC Affiliates" or "AAC"). During an August 1, 2015 conference call, Defendant Cartwright admitted that these affiliates and subsidiaries were "part of our [AAC] organization."

AAC facility are deeply troubling, this case is not about his death.[3] Instead, it involves the Insider Defendants' deliberate disregard of their federal securities law disclosure obligations by concealing the criminal investigation into the circumstances surrounding Mr. Benefield's death.

7. Prior to the IPO, the Insider Defendants knew or were at least deliberately reckless in not knowing that the AAC Affiliates and Defendant Menz were under criminal investigation by the California DOJ. On August 29, 2013, California Deputy Attorney General Hardy R. Gold ("DAG Gold") executed a sworn declaration (the "DAG Gold Declaration") stating that the California DOJ's "criminal investigation of [AAC Affiliates] in [sic] ***continuing*** and nearing completion. I anticipate that ***criminal charges will be filed***."[4] The DAG Gold Declaration was filed in a lawsuit brought by Defendant Menz and the AAC Affiliates for defamation against a whistleblower who had provided background information for the California DOJ's investigation into Mr. Benefield's death.[5]

8. On September 18, 2013, Defendant Menz was personally copied on a letter from his counsel (Barry P. King) to California Chief Deputy Attorney General Nathan R. Barankin that specifically referenced DAG Gold's August 29, 2013 Declaration, including DAG Gold's representation that criminal charges involving AAC were imminent. The same letter even expressly complained about the fact that the California DOJ was

---

[3] Mr. Benefield was a resident at one of AAC's California facilities called "A Better Tomorrow." Mr. Benefield died alone in his room there in July 2010 after being plied with "house" drugs that AAC had no license to administer and by an AAC employee who had no medical training. Underscoring the severity of the misconduct uncovered by the California DOJ, no other corporation has been charged with murder since California was granted statehood over 165 years ago. *See* §V.A.3, *infra*.

[4] All emphasis added unless otherwise noted.

[5] The defamation lawsuit against whistleblower Charles Hill was subsequently dismissed.

investigating Defendant Menz. Once the results of the California DOJ investigation and the full extent of Defendants' Class Period misconduct became known with the unsealing of the indictment against Defendant Menz and the AAC Affiliates for second-degree murder, the Company's share price plummeted by as much as 50% on enormous trading volume of over 8 million shares traded as depicted below:[6]




**B. Defendants' Class Period Misrepresentations and Material Omissions Were Made with Scienter**

9. On October 1, 2014, the SEC declared as effective the Registration Statement that AAC previously filed with the SEC on Form S-1. The Class Period commences with the filing of AAC's Prospectus on Form 424(B)(4) with the SEC on October 2, 2014 (together, the Registration Statement on Form S-1 and the Prospectus on Form 424(B)(4)

---

6 The Company's average daily trading volume during the Class Period was roughly 225,000 shares.

are defined herein as the "Registration Statement"). Each of the Insider Defendants, except Defendant McWilliams, signed the Registration Statement.

10. The Registration Statement not only failed to disclose the then-ongoing criminal investigation by the California DOJ, but affirmatively misrepresented that Defendants were: (i) "not aware of ***any*** material pending or threatened investigations involving allegations of wrongdoing;" and (ii) "not aware of ***any*** legal proceedings the ultimate outcome of which, in our judgment based on information currently available, would have a material adverse effect on our business, financial condition or results of operations." As alleged in §V.D, *infra*, Defendants' other Class Period filings with the SEC repeated these and similar material misrepresentations.

11. The Insider Defendants were, however, acutely aware of such facts. In addition to being aware of the August 29, 2013 DAG Gold Declaration, Defendants Menz and Cartwright filed documents in the *Benefield* Litigation related to the ongoing parallel criminal investigation into Mr. Benefield's death. The *Benefield* Litigation was initiated by Mr. Benefield's widow against Defendant Menz, the AAC Affiliates and others alleging, *inter alia*, wrongful death, willful misconduct and intentional misrepresentation/fraud.[7] On March 18, 2013, as part of an effort to stay discovery in the *Benefield* Litigation, Defendant Menz and the AAC Affiliates (through their attorney of record Melinda Belew Owen) provided a sworn declaration stating, *inter alia*, that "[o]n March 13, 2013, I was provided with information that the California Department of Justice – Bureau of Medi-Cal Fraud and Elder Abuse is apparently conducting an investigation with respect to one or more of the

[7] It later settled for an undisclosed sum.

defendants in [the *Benefield* Litigation]." One such defendant, of course, was Defendant Menz.

12. In a subsequent April 11, 2013 filing in the *Benefield* Litigation, Defendant Menz's counsel detailed how she had learned that the "Department of Justice was investigating defendant ABTTC, Inc. with respect to the death of a resident at the facility," and concluded that "[i]t is ***undisputed*** that agents from the Department of Justice – Department of Medi-Cal Fraud and Elder Abuse are ***currently investigating the defendants*** in [the *Benefield* Litigation]." Defendant Menz, through counsel, later expressed his intention to invoke his rights under the Fifth Amendment in the *Benefield* Litigation. On March 11, 2014, Defendant Cartwright filed a motion for a protective order in the *Benefield* Litigation and submitted a sworn declaration in support thereof seeking to distance himself from Defendant Menz and Mr. Benefield's death.[8]

13. Notably, Defendants concealed the California DOJ's investigation throughout the Class Period even though they simultaneously disclosed other far less consequential litigation involving the AAC. The Company, for instance, disclosed a lawsuit against someone named James Bevell for "breach of contract and tortious interference with business practices arising out of Mr. Bevell's breach of his non-compete agreements." While disclosing this and other such matters, Defendants hid the ongoing and intensifying criminal California DOJ investigation into Mr. Benefield's death because they knew that its disclosure would have disastrous consequences for the Company's operations, prospects and marketing efforts.

[8] The AAC Affiliates became part of publicly-traded AAC in the IPO.

14. Ultimately, as alleged throughout herein, the Insider Defendants recklessly gambled that the California DOJ investigation would never materialize into an indictment. Not only were they were wrong but, under the federal securities laws, the "fact that a gamble…fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble."[9]

15. Indeed, now that Defendant Menz and the AAC Affiliates are under murder indictment, the AAC Affiliates, which account for nearly 20% of AAC's total annual revenues, will undoubtedly have their operating licenses revoked if convicted of the charges. In addition, potential revenue-generating AAC clients who now research AAC's facilities will discover that the Company's former President (*i.e.*, Defendant Menz) and the AAC Affiliates were indicted for the abuse and murder of an AAC client.

16. Defendants clearly knew that criminal charges by the California DOJ were a risk that the Company's shareholders should have been made aware of when the Company went public in early October 2014. Defendants also understood the importance of AAC's California-based affiliates to the Company's shareholders. The Company's Class Period filings with the SEC acknowledged that:

> We derive a significant portion of our revenues from three treatment facilities located in ***California***, Nevada and Texas. These treatment facilities accounted for 76.5% of our total revenues in 2013 and 81.5% for the six months ended June 30, 2014…. If any event occurs that would result in a complete or partial shutdown of any of these facilities…such event could lead to decreased revenues and/or higher operating costs, which could have a material adverse effect on our revenues, profitability and cash flows.

---

[9] *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.).

17. Defendants also knew that losing Defendant Menz, who has since resigned as AAC's President following the indictment, to a criminal investigation could "significantly" disrupt the Company's operations. AAC acknowledged in its SEC filings at all relevant times that it depended:

> [H]eavily on key management personnel, and the departure of one or more of our key executives or a significant portion of our local facility management personnel or sales force could have a material adverse effect on our business, financial condition and results of operations.
>
> The expertise and efforts of our key executives, including our chief executive officer, ***president*** [*i.e.*, Defendant Menz], chief operating officer, chief financial officer and general counsel, and other key members of our facility management personnel and sales staff are critical to the success of our business…. The loss of the services of one or more of our key executives or of a significant portion of our facility management personnel or sales staff could significantly undermine our management expertise and our ability to provide efficient, quality healthcare services at our facilities.

18. The Insider Defendants also had strong personal motive to conceal the California DOJ investigation. Had investors known that Defendant Menz and the AAC Affiliates were under an active criminal investigation at the time of the IPO, for instance, the Insider Defendants would have had grave difficulty consummating the IPO and/or personally benefitting from selling their shares in the IPO as alleged in §V.A.4, *infra*.

19. Defendants also knew that disclosing a criminal investigation could negatively impact the Company's critically-important "growth-by-acquisition" business strategy. First, a material development like an ongoing criminal investigation could constitute a "material adverse effect" as defined by the Company's credit facilities. *See* ¶¶V.B, *infra*. Moreover, because Defendants used artificially inflated shares of AAC's common stock to consummate the acquisitions as described in §V.C, *infra*, fewer shares of AAC's stock had to be issued to consummate AAC's stock-based acquisitions. Because

fewer shares were issued, AAC also suffered less stock dilution which, in turn, inflated AAC's publicly-reported Class Period earnings per share. The Insider Defendants' core growth-by-acquisition strategy generated a far higher stock price than the Company would otherwise have had but for their concealment of and misrepresentations concerning the California DOJ investigation. Then, on July 21, 2015, the California grand jury investigating Defendant Menz, the AAC Affiliates and others filed a second-degree murder and dependent adult abuse indictment charging them with, *inter alia*, "unlawfully, and with malice aforethought, murder[ing] GARY BENEFIELD, a human being."

**C. The Truth Emerges**

20. After the close of trading on July 29, 2015 – the same day the indictment was unsealed and Defendant Menz was arraigned – AAC partially disclosed that "charges" had been brought "against subsidiaries of AAC and two current and three former employees." Defendants, however, failed to disclose that the charges included the second-degree murder and dependent adult abuse of Mr. Benefield.

21. The same day the indictment became public (*i.e.*, July 29, 2015), the Company also reported better than expected financial results for AAC's 2015 second quarter. As alleged in more detail in §VI, *infra*, the timing of the Company's earnings announcement was no coincidence. In response to these mixed announcements, AAC's stock price slid by $1.58 per share on July 30, 3015. Then, on August 1, 2015, the Company hosted an earnings conference call where Defendant Cartwright claimed that, while he was "just now having the opportunity to review [the six page] indictment," he "firmly believe[d] that the California Department of Justice case is without merit." Defendant Cartwright's half-denial was designed to and did maintain the artificial inflation

in the Company's share price and failed to disclose that several AAC employees had already previously invoked their Fifth Amendment rights in the *Benefield* Litigation.

22. On August 3, 2015, as the market fully began digesting the full import of the previous days' events, *TheStreet* published a report entitled "How Murder Charges Could Hurt AAC Holdings" detailing new facts about the indictment and *Benefield* Litigation. AAC's stock price fell again on August 3, 2015, declining $5.22 per share, or 14%. On August 4, 2015, Bleecker Street Research ("*Bleecker*") published a lengthy report entitled "American Addiction Centers: Even More Undisclosed Deaths and the Start of Real Problems" revealing damning new facts and details about the indictment and history of wrongdoing at the AAC Affiliates.[10]

23. In response to the *Bleecker* report, AAC's common stock plunged 50%, falling by $12.90 per share on August 4, 2015. Overall, the price of AAC's common stock has fallen by nearly $20 per share, or 49% since the truth was revealed, wiping out approximately $150 million in market capitalization. Then, after the Class Period, *Forbes* published an article on August 5, 2015 titled "AAC Holdings' Lawyers Knew About Criminal Investigation in 2013" reporting, *inter alia*, that "[i]n a response to questions from *Forbes* about when it became aware of the criminal investigation, the company said in a statement last week it learned of the grand jury investigation into the death of Gary Benefield about six weeks ago."

24. The same article described how "AAC Holdings had not disclosed the criminal investigation into Gary Benefield's death in any of its securities filings that were

---

[10] The author of the *Bleecker* report disclosed that he was short AAC and also included numerous documents and first-hand accounts surrounding Mr. Benefield's death.

made with the SEC as it prepared for its IPO last year ***or since***, until the indictment was unsealed." Moreover, despite that the Company told *Forbes* it became aware of the grand jury investigation at least six weeks prior to August 5, 2015, the Insider Defendants failed to timely disclose even that material fact to the market.

25. The Company's filings with the SEC now finally warn investors that AAC "cannot estimate the amount or range of loss if the defendants were to be convicted; however, such loss could be ***material***." Too-little-too-late for the Company's shareholders who suffered substantial damages as a result of Defendants' concealment of and misrepresentations concerning the California DOJ investigation into Mr. Benefield's death.

## III. JURISDICTION AND VENUE

26. The claims herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

27. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

28. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as AAC has its principal executive offices located in this District and conducts substantial business here.

29. In connection with the acts, omissions, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## IV. PARTIES

### A. Lead Plaintiffs

30. Lead Plaintiff Dr. Gills purchased AAC's securities during the Class Period as described in his Certification attached hereto, and as incorporated by reference herein, and suffered damages thereon.

31. Lead Plaintiff ATRS manages over $15 billion in assets on behalf of tens of thousands of beneficiaries associated with the education community in Arkansas. ATRS purchased AAC's securities during the Class Period as described in its Certification attached hereto, and incorporated by reference herein, and suffered damages thereon.

### B. Defendants

32. Defendant AAC purports to provide substance abuse treatment services for individuals with drug and alcohol addiction. It also purports to provide treatment services for individuals struggling with behavioral health disorders. AAC, through its subsidiaries, operates approximately seven residential substance abuse treatment facilities, five standalone outpatient centers and one facility for overeating-related behavioral disorders. The Company is incorporated in Nevada and its principal executive offices are located at 115 East Park Drive, Second Floor, Brentwood, Tennessee 37027. The Company's common shares trade on the NYSE under the ticker symbol "AAC."

33. AAC is a holding company with nominal net worth. According to its filings with the SEC, the holding entity itself does not conduct any business operations other than its investments in its subsidiaries, like the AAC Affiliates. AAC Holdings, Inc. was incorporated as a Nevada corporation on February 12, 2014 for the purpose of acquiring all of the common stock of American Addiction Centers, Inc. The Company's business

operations are conducted primarily out of its direct operating subsidiary, American Addiction Centers, Inc. Only approximately 100 people work at the Company's Brentwood, Tennessee corporate headquarters, including, at present, Defendants Cartwright, Manz, Menz and McWilliams.

34. Defendant Michael T. Cartwright is and was at all relevant times the Company's Chairman and CEO. He has served as Chairman of the Board of Directors ("Board") since 2011 and CEO since June 2013. In 2009, Defendant Cartwright co-founded Performance Revolution, LLC (d/b/a FitRx), a company focused on weight management and served as its CEO until it merged into Forterus, Inc. ("Forterus") in 2011. Forterus changed its legal name to American Addiction Centers, Inc. in 2012. Because of his senior position with the Company, Defendant Cartwright possessed the power and authority to control the contents of press releases, investor and media presentations and all filings AAC made with the SEC during the Class Period. Defendant Cartwright also certified the Company's periodic Class Period financial reports filed with the SEC under the Sarbanes-Oxley Act of 2002 and regularly spoke with investors and securities analysts about the Company.

35. Defendant Cartwright signed the Company's: (i) Form S-1 Registration Statement filed with the SEC on July 11, 2014 and declared effective by the SEC on October 1, 2014; (ii) Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2014 filed with the SEC on November 12, 2014; (iii) Annual Report on Form 10-K for the fiscal year ended December 31, 2014 filed with the SEC on March 10, 2015; (iv) Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015 filed with the SEC on May 4, 2015; (v) Quarterly Report on Form 10-Q for the quarterly

period ended June 30, 2015 filed with the SEC on August 3, 2015; and (vi) participated on the Company's August 1, 2015 and October 29, 2015 earnings conference calls with analysts and investors.

36. Defendant Jerrod N. Menz was at all relevant times the President and member of the Board of AAC until his indictment for murder. In 2004, Mr. Menz founded ABTTC, Inc. d/b/a "A Better Tomorrow Treatment Centers" ("ABTTC"), an alcohol and drug treatment provider in southern California, until Forterus acquired A Better Tomorrow in 2008. Defendant Menz previously served as the CEO of American Addiction Centers, Inc. (formerly Forterus) from 2011 until 2013. From 2009 until 2011, he served Forterus in the roles of Vice President and Secretary. Defendant Menz remains an employee of AAC despite his resignation as President. The entities ABTTC, Forterus and Forterus Health Care Services, Inc. are referred to herein collectively as the "AAC Affiliates" or "AAC."

37. Because of his senior position with the Company, Defendant Menz possessed the power and authority to control the contents of press releases, investor and media presentations and all filings AAC made with the SEC during the Class Period. Defendant Menz signed the Company's: (i) Form S-1 Registration Statement AAC filed with the SEC on July 11, 2014 and declared effective by the SEC on October 1, 2014; and (ii) Annual Report on Form 10-K for the fiscal year ended December 31, 2014 filed with the SEC on March 10, 2015.

38. Defendant Kirk R. Manz is and was at all relevant times the Company's Chief Financial Officer. Defendant Manz joined AAC as CFO in January 2011. Because of his senior position with the Company, Defendant Manz possessed the power and authority to control the contents of press releases, investor and media presentations and all

filings AAC made with the SEC during the Class Period. Defendant Manz certified the Company's periodic Class Period financial reports filed with the SEC under the Sarbanes-Oxley Act of 2002 and regularly spoke with investors and securities analysts about the Company.

39. Defendant Manz signed the Company's: (i) Form S-1 Registration Statement filed with the SEC on July 11, 2014 and declared effective by the SEC on October 1, 2014; (i) Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2014 filed with the SEC on November 12, 2014; (ii) Annual Report on Form 10-K for the fiscal year ended December 31, 2014 filed with the SEC on March 10, 2015; (iii) Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015 filed with the SEC on May 4, 2015; (iv) Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015 filed with the SEC on August 3, 2015; and (iv) participated on the Company's August 1, 2015 and October 29, 2015 earnings conference calls with analysts and investors.

40. Defendant Andrew W. McWilliams is the Company's Chief Accounting Officer. Defendant McWilliams joined the Company as Chief Accounting Officer in August 2014. From October 1998 through August 2014, Defendant McWilliams worked as an auditor with Ernst & Young LLP ("E&Y"). During his tenure with E&Y, Defendant McWilliams gained experience across a variety of corporate transactions, including public offerings of securities like the IPO and mergers and acquisitions. Because of his senior position with the Company, Defendant McWilliams possessed the power and authority to control the contents of press releases, investor and media presentations and all filings AAC made with the SEC during the Class Period. Defendant McWilliams regularly spoke with investors and securities analysts regarding the Company.

41. Defendant McWilliams signed the Company's: (i) Annual Report on Form 10-K for fiscal year ended December 31, 2014 filed with the SEC on March 10, 2015; (ii) Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015 filed with the SEC on May 4, 2015; (iii) Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015 filed with the SEC on August 3, 2015; and (iv) participated on the Company's August 1, 2015 and October 29, 2015 earnings conference calls with analysts and investors.

42. The defendants referenced in ¶¶33-41, *supra*, are collectively referred to herein as the "Insider Defendants."

43. Because of their positions with the Company, the Insider Defendants possessed the power and authority to control the content and form of AAC's Registration Statement, annual report, quarterly reports, press releases and presentations to the SEC, securities analysts, money and portfolio managers and investors (*i.e.*, the market). They were provided with copies of the SEC filings alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Insider Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading.

44. The Insider Defendants each made materially misleading statements during the Class Period by speaking on earnings conference calls, signing the Company's SEC filings and/or making presentations to investors. At all relevant times, the Insider

Defendants possessed the power and authority to control the contents of AAC's press releases, investor and media presentations and SEC filings. The Insider Defendants were also intimately involved with and aware of, or deliberately disregarded, all aspects of the Company's operations.

45. While not named as an Insider Defendant at this time, as General Counsel and Secretary of AAC, Kathryn Sevier Phillips ("Phillips") also possessed the power and authority to control the contents of press releases, investor and media presentations and all filings AAC made with the SEC during the Class Period. At all relevant times, Ms. Phillips was AAC's chief lawyer and reported directly to Defendant Cartwright. In her role, Ms. Phillips either knew about or was severely reckless in not being aware of the *Benefield* Litigation and California DOJ investigation. She also participated alongside the Insider Defendants in making the ultimate decision to conceal the criminal investigation from AAC's shareholders. She was rewarded for doing so as alleged in ¶84, *infra*.

46. At all relevant times, each of the Insider Defendants had access to the adverse undisclosed information about AAC's business, operations and practices through access to internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings and through reports and other information provided to them. The Insider Defendants were directly involved in the day-to-day operations of AAC at its highest levels. They each bear responsibility for the accuracy of the public reports and press releases detailed herein, and is therefore primarily liable for the misrepresentations and omissions contained therein.

47. The Insider Defendants also each substantially participated in and had exclusive authority and control over the content of AAC's false and misleading statements

and how they were communicated to investors. They also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of AAC's misleading statements, all of which made it necessary or inevitable that material misrepresentations and omissions would be communicated to, and mislead, investors. Defendants' scheme deceived the investing public regarding AAC's operations and the intrinsic value of AAC's securities, and caused Plaintiffs and other members of the Class to be damaged as a result of their purchases of the Company's securities at artificially inflated prices.

48. The federal securities laws required the Insider Defendants not to falsify AAC's SEC filings and prohibited them from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person. Their conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of AAC's securities.

49. The Company's press releases and SEC filings were group-published documents, representing the collective actions of the Company management. The Insider Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the

Company, and approved or ratified these statements, in violation of the federal securities laws.

50. The Insider Defendants were well-aware of their disclosure obligations under the Company's own Code of Ethics. The April 15, 2015 Definitive Proxy Statement that AAC filed pursuant to Section 14(a) of the Exchange Act, for instance, acknowledged that:

> We have adopted a Code of Business Conduct and Ethics that ***applies to our officers, directors and employees***. Among other matters, the Code of Business Conduct and Ethics is designed to deter wrongdoing and to promote:
>
> - honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
> - full, fair, accurate, timely and understandable disclosure in our SEC reports and other public communications;
> - compliance with applicable laws, rules and regulations;
> - prompt internal reporting of violations of the code to appropriate persons identified in the code; and
> - accountability for adherence to the Code of Business Conduct and Ethics.
>
> [O]ur Board has adopted a Code of Ethics for Senior Financial Officers that is specifically applicable [sic] the Company's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and Controller. Its purpose is to deter wrongdoing and to promote honest and ethical conduct, and compliance with the law, particularly as it relates to the maintenance of the Company's financial records and the preparation of financial statements filed with the SEC.

51. In addition, the Company's "Code of Ethics for Senior Financial Officers" (the "Code") (*i.e.*, Defendants Cartwright, McWilliams and Manz), as adopted by the Board of Directors on June 3, 2014, similarly provided at all relevant times that "it is the responsibility of each Senior Financial Officer to report to the Disclosure Committee any untrue statement of material fact and any omission of material fact of which he or she may

become aware that affect the disclosures made by the Company in its public filings or submissions or other public communications."

52. Moreover, under the Code, AAC's Senior Financial Officers were required to "promptly bring to the attention of the General Counsel or the CEO and the Audit Committee any information he or she may have concerning evidence of a violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof." In an effort to make this provision enforceable, Defendants Cartwright, Manz and McWilliams "annually sign[ed] an attestation form indicating compliance with this Code of Ethics." As alleged throughout herein, they failed to comply with either the Code or their federal securities law obligations.

## V. VIOLATIONS OF THE EXCHANGE ACT

### A. Company and Regulatory Background

#### 1. The Addiction Business

53. Addiction is a chronic disease that affects brain function and behavior. The abuse of drugs and alcohol is one of the most common and serious forms of addiction and, if left untreated, can lead to a variety of negative social conditions. The 2012 National Survey on Drug Use and Health estimated that approximately 23.1 million people aged 12 or older needed treatment for a drug or alcohol use problem in the United States in 2012. Only 2.5 million, or 10.8% of those needing treatment, received treatment at a specialty facility. The National Comorbidity Survey reports that up to 65% of adults with substance abuse addiction also have a co-occurring mental health disorder such as depression, bipolar disorder and schizophrenia, occurring concurrently with substance abuse.

54. Given the nature of substance abuse treatment, potential patients have control in deciding when to seek treatment and who to select as their treatment provider. Clients are typically not limited to their local geographic area in selecting a treatment facility and providers are able to market and advertise directly to potential clients and their families on a national level. AAC and the Insider Defendants cynically exploited the addiction epidemic in a manner that has harmed the Company's reputation, damaged its shareholders and caused the death of numerous residents at its treatment facilities.

**2. AAC's Checkered Past**

55. In 2004, Defendant Menz established a residential drug and alcohol treatment company in California called ABTTC, Inc., or A Better Tomorrow. In 2008, Defendant Menz took A Better Tomorrow public through a reverse merger with an over-the-counter shell.[11] The Company then changed its name to Forterus but continued operating its clinics under the A Better Tomorrow name until Forterus stopped filing financial statements with the SEC and became a non-reporting company.

56. Forterus then acquired Performance Revolution, LLC (d/b/a FitRx) based in Brentwood, Tennessee in 2011, which was owned by Defendant Cartwright, himself reported to be a former addict. Together, they began identifying properties to develop into residential addiction treatment centers. Forterus/A Better Tomorrow remain some of AAC's largest subsidiaries/affiliates and account for approximately 20% of the Company's revenues. In 2011, Defendants Menz and Cartwright also purchased Greenhouse, which opened in March 2012 and Desert Hope treatment center, which opened in January 2013.

---

[11] According to the SEC, reverse mergers enable companies to avoid the registration requirements required for IPO's and, accordingly, warns investors that they "should be especially careful when considering investing in the stock of reverse merger companies."

In 2012, they also consummated the "TSN Acquisition," which added three facilities in Florida and New Jersey (one of which was subsequently closed) and a national sales and marketing program. In conjunction with the TSN Acquisition, the company changed its name to American Addiction Centers, Inc., or AAC.

57. In 2012, a report called "Rogue Rehabs" prepared for the Senate Rules Committee by the California Senate Office of Oversight and Outcomes (the "California Senate Report") highlighted numerous disturbing operational issues at the AAC facilities, including several formerly undisclosed deaths and the eventual revoking of one facility's treatment license. The report described, for instance, how one patient, Roberta McMinn, died just three days after she was admitted. The California Senate Report documented how Ms. McMinn was unable to walk under her own support when she was admitted and that, on the day she died, she was found pale and vomiting in her bed. While an AAC Affiliate office worker told investigators that he knew CPR, the California Senate Report noted that no one from the facility ever attempted to revive Ms. McMinn.

58. The California Senate Report also questioned how Ms. McMinn obtained so many anti-depressants at the AAC facility to cause the intoxication that contributed to her death. The report also described how Ms. McMinn was admitted against her will even though, in California, a person has to be declared a danger to themselves or others to be committed to a facility without their permission. Unlabeled medications were found in Ms. McMinn's bag after her death, and the coroner's report made reference to Ms. McMinn having seen the "facility's psychiatrist," which seemed to suggest that the facility was providing medical care in violation of California state law.

59. The second death occurred on the same day an AAC Affiliate patient was admitted. According to the California Senate Report, employees never made any attempt to provide the individual a medical assessment after suffering a seizure. In the third death, the report accused the AAC Affiliates of mischaracterizing the death in its mandatory report to the state. The death report stated that the resident had been able to function on his own when he arrived but the Company's own records reflected that he was "incontinent, jaundiced and very weak." Although the patient told the facility that he had suffered from liver disease, staff failed to conduct a medical assessment.

60. The fourth death occurred when Mr. Benefield flew from his home in Arizona to an AAC center in California seeking treatment. He died the following day, on his 53rd birthday. The California Senate Report found that he was coughing and wheezing when he landed in San Diego and that:

> His oxygen tank had been emptied at the airport because of flight regulations. Benefield suffered from chronic obstructive pulmonary disease, emphysema and had recently been hospitalized for pneumonia. Despite all this, the program failed to get him an oxygen tank. It also gave him an anti-depressant and an anti-anxiety drug without a prescription and before he had seen Dr. Bumby, listed on the program's website as "an outside medical consultant." It got the drugs from an "extra supply" it kept on hand. Staff members failed to check on Benefield after 12:30 a.m., contrary to its own guidelines, because ***they were asleep***.

61. As a result of the foregoing, the California Department of Alcohol and Drug Program suspended the facility's license which had no impact on A Better Tomorrow because that particular facility had already been closed as the result of a foreclosure. The issues identified in the California Senate Report occurred from 2008 to 2010. In July 2011, Defendant Menz's profoundly troubled California-based facilities announced that they were

merging with Performance Revolution, LLC which was located in Brentwood, Tennessee and founded by Defendant Cartwright.

### 3. The Alleged Murder of Mr. Benefield and the *Benefield* Litigation

62. Gary Benefield lived in Arizona. He and his wife, Kelly, decided that he should locate a rehabilitation center to help treat his alcohol dependency. Mrs. Benefield located a detox service on the internet called "A Sober Solution" and contacted them. Shortly thereafter, she received a call from AAC Affiliate, A Better Tomorrow. The facility was referred to Mrs. Benefield by "A Sober Solution" and advised her that Mr. Benefield would be well cared for at the facility, receive immediate medical attention, physical therapy, counseling and detoxification. After being advised that Mr. Benefield absolutely required constant oxygen due to his medical condition, the AAC representative assured Mrs. Benefield that oxygen would be available for her husband immediately upon his arrival at the treatment facility. This was false. The facility had no oxygen supplies whatsoever.

63. Based on AAC's representations, Mr. Benefield thereafter flew from Phoenix to San Diego on the afternoon of July 25, 2010. He was driven from San Diego airport to AAC's facility by AAC employee, Robert Swensrud. In a sworn declaration by Frank Sheridan, M.D. (the Chief Medical Examiner for the San Bernardino County Coroner's Office) dated February 2, 2014, Dr. Sheridan recounted that AAC had assured Mrs. Benefield that her husband "would be well cared for, he would receive his necessary oxygen and that a doctor would monitor his detoxification." Dr. Sheridan's declaration added that, upon arriving in San Diego, "Mr. Swensrud stated that he could immediately tell that Gary [Benefield] was very sick and needed a higher level of care than could be

provided by [AAC]…. Mr. Swensrud also told [his supervisor] that Gary's oxygen tank was empty…."

64. After arriving at the AAC facility, Mr. Benefield's phone was confiscated and he was forbidden from placing or receiving any phone calls including to and from his wife, Kelly. At no point during his admission did anyone fill his oxygen tank. Nor did Mr. Benefield receive any medical evaluation. In fact, the physician who would likely have seen Mr. Benefield, Dr. Noreen A. Bumby, was herself alleged to be an alcoholic. Dr. Bumby served as the medical director at the facility and held that post at the time Mr. Benefield died there on June 26, 2010. Dr. Bumby developed the "detox protocol" that apparently administered drugs to residents without a prescription before being seen by a doctor. In December 2009, six months before Mr. Benefield died, California's Osteopathic Medical Board filed a seventeen-page public complaint against Dr. Bumby recommending that her license be revoked or suspended. Dr. Bumby was ultimately put on probation for multiple acts of "gross negligence" including for being repeatedly under the influence of alcohol.

65. On the morning of July 26, 2010, Mr. Benefield was found dead in his bedroom on the floor beside his empty oxygen tank. Dr. Sheridan later concluded that the failure "to provide oxygen was the major factor in causing [Mr. Benefield's] death on 7/26/2010." Dr. Sheridan later concluded that "it can be stated that ABT [A Better Tomorrow] either caused or contributed to the deaths of: Gary Benefield[,] Roberta McMinn[,] James Sisk[,] Gregory Thomas[, and] Shawn Reyna."

66. The Murrieta Police Department death report for Mr. Benefield dated July 26, 2010 was written by Police Officer M. Mozingo who conducted interviews with

witnesses about Mr. Benefield's death. His notes were memorialized in official Murrieta Police Department Crime Reports. Officer Mozingo responded to the AAC facility to assist on the death investigation and was told that, by the time Mr. Benefield was found dead in his room, his body already had "obvious signs of rigor and lividity." Indeed, no one had checked on Mr. Benefield for several hours because the facility's staff had overslept.

67. In a Supplemental Police Report dated August 31, 2010, Detective Phil Gomez memorialized his interview with the AAC facility's "house manager" Kristopher McCausland who lived at the facility where Mr. Benefield died. In the report, Detective Gomez stated, *inter alia*, the following facts: (i) Mr. McCausland "admitted he has been in trouble with the law in the past and has a ***felony record***. McCausland also told me he has graduated from a drug treatment program through the Salvation Army. McCausland's drug of choice was ***methamphatemine***;" (ii) "McCausland did not receive any specific training prior to starting at A Better Tomorrow;" (iii) "McCausland told me he had never received any medical training prior to be[ing] employed by A Better Tomorrow;" (iv) when asked if the program was voluntary, "[h]e did say that they do not assist a client if they want to leave. McCausland said, 'We don't make it easy for them.' He explained that there is no landline phone at the residence, the clients do not have phone privileges during the first seven days and they do not provide any form of transportation to the clients who want to leave;" (v) "McCausland admitted that he was told that a male detox client would be arriving that day that ***required oxygen***. McCausland never cared for a client that required

oxygen;" (vi) "McCausland said he has never known of A Better Tomorrow to turn down a client for medical reasons."[12]

68. Despite Mrs. Benefield's clear instructions and stated concerns about her husband's need for oxygen, Defendant Menz represented to Officer V. Carrillo on July 28, 2010 that "no one had requested oxygen be provided for Gary Benefield." A sworn declaration by former AAC employee Jose Rutilo Ochoa executed on April 29, 2014 that was submitted in the *Benefield* Litigation contradicts Defendant Menz's assertion. Mr. Ochoa stated that he had:

> [E]xtensive interaction with Mr. Menz. Prior to Gary Benefield's arrival at ABTTC I was part of the management team that was directed by Mr. Menz. As part of the management team I sat in weekly management meetings and regularly talked with Mr. Menz.
>
> On our about the Thursday before Mr. Benefield arrived, I received a call from Jodi Brueske the intake coordinator for Gary Benefield. This email included specific information about Gary Benefield's medical condition [] and ***need for oxygen 24/7***.
>
> When I received the email about Mr. Benefield I asked Mr. Fent to not bring in Mr. Benefield as I knew we could not take care of all his medical needs, and that it ***would be dangerous*** to bring in Mr. Benefield to ABTTC's care and custody.
>
> Mr. Fent said he would speak with Mr. Menz who would be the one making the decision whether Gary Benefield was going to come to ABTTC. A while later Mr. Fent told me that he had spoken to Mr. Menz about Mr. Benefield, and that Mr. Menz had authorized the admission of Gary Benefield.
>
> The[re] is no question in my mind that Mr. Menz knew of Gary Benefield's pending arrival at ABTTC, and that he was the ultimate decision maker on whether or not ABTTC should admit Gary Benefield in light of his extensive medical issues and needs.

---

[12] Mr. McCausland invoked his Fifth Amendment rights during his June 5, 2013 deposition in the *Benefield* Litigation.

69. In his testimony before the grand jury, former AAC employee Jose Ochoa described how Defendant Menz left what was then a crime scene with a garbage bag filled with approximately five pounds of prescription medication. According to grand jury testimony from Janelle Ito-Orille (California Department of Health Care Services), the drugs that Defendant Menz drove away from the facility with should never have even been there in the first place because the AAC facility lacked a license to administer such drugs.

70. On July 26, 2011, Mrs. Benefield filed a Complaint for Damages against AAC subsidiaries ABTTC, Forterus, Forterus Health Care Services Inc., Defendant Menz and other AAC employees in California Superior Court. Mrs. Benefield filed her Second Amended Complaint for Damages in 2012, which again named as defendants the same AAC entities along with Defendant Menz and James Andrew Fent ("Fent"), another AAC Affiliate executive.[13] Mrs. Benefield brought six causes of action against defendants including, *inter alia*, wrongful death, willful misconduct and intentional misrepresentation/fraud.

71. On March 18, 2013, as part of an effort to stay discovery in the *Benefield* Litigation, Melinda Belew Owen, attorney of record for Defendant Menz and the AAC Affiliates, described how she "was provided with information that on March 13, 2013, Senior Legal Analyst Patti Moffit and Special Agent Thomas Garvin, both of the Department of Justice – Bureau of Medi-Cal Fraud and Elder Abuse" questioned a former employee of the AAC Affiliates regarding the AAC Affiliates, Defendant Menz and certain employees of the AAC Affiliates.

---

[13] Mr. Fent was at all relevant times a director of Forterus and an officer of ABTTC, Inc. and, in those capacities, worked directly with Defendant Menz.

72. Defendant Menz, through Ms. Owen, later filed a motion for use immunity on April 25, 2013 to preclude use of deposition answers or produced evidence in the *Benefield* Litigation from being used in the parallel California DOJ proceedings, arguing:

> Since some (or all) of the defendants may be the target of a criminal investigation by the Department of Justice – Bureau of Medi-Cal Fraud and Elder Abuse, each of the individual defendants and the employees/former employees of the corporate defendants may plead the Fifth Amendment at their respective depositions…. However, doing so will severely prejudice each of the defendants in this civil action….
>
> * * *
>
> [T]here is a very high risk that facts developed at the depositions of [Defendant] Menz, Josie Gann and James Fent, and current/former employees of defendants, ABTTC, Inc. dba A Better Tomorrow Treatment Center, Forterus, Inc. and Forterus Health Care Services, Inc., relating to how this event [Mr. Benefield's death] occurred cannot only support a criminal charge, but ***provoke one***.

73. On May 13, 2013, Supervising Deputy District Attorney Michael J. Quesnel ("SDDA Quesnel") of Riverside County filed an objection to the motion for use immunity, declaring under penalty of perjury that:

> I am informed and believe that the [death of Gary Benefield] is currently under investigation by the California Attorney General's Office. The District Attorney's Office prosecutes crimes within Riverside County investigated by the Murietta Police Department. In addition, the Attorney General's Office frequently refers criminal conduct within Riverside County which they have investigated to the District Attorneys' Office for prosecution…. I believe that the proposed grant of immunity in this civil case might unduly hamper the prosecution of a potential criminal proceeding.

74. California Attorney General Kamala Harris opposed the motion for use immunity in May 2013, arguing that staying the depositions "would unduly hamper an anticipated criminal ***prosecution*** involving one or more civil defendants." Specifically, on May 13, 2013, DAG Gold signed a declaration in the *Benefield* Litigation stating, in part, that:

> I am a Supervising Deputy Attorney General and I share responsibility for all of this Bureau's criminal prosecutions in Southern California with my counterpart from our Los Angeles Regional Office. In this capacity, I am aware of a criminal investigation actively being conducted by Special Agent Tom Garvin involving circumstances of the death of Gary Benefield.
>
> I have spoken to Agent Garvin about the state of his investigation following this office receiving service of the defendants' motion. He discussed with me conduct he has learned of through his investigation. On its face, the conduct that Agent Garvin told me about ***appears to be criminal,*** based on my 22 years as a prosecutor. Agent Garvin and I also discussed what additional evidence may be needed to bring criminal charges and prove them beyond a reasonable doubt. I encouraged Agent Garvin to move forward to expeditiously conclude his investigation ***so that charges can be filed***.

75. Then, on May 24, 2013, California DOJ Special Agent Thomas Garvin sent a letter to the custodian of records for A Better Tomorrow requesting documents in connection with the "criminal investigation concerning the business [A Better Tomorrow] listed above." In a May 30, 2013 filing in the *Benefield* Litigation in support of a renewed motion to stay discovery, Ms. Owen asserted that SDDA Quesnel's May 13, 2013 declaration "***unequivocally*** establishes that the moving defendants [Defendant Menz, the AAC Affiliates and certain employees of the AAC Affiliates] are currently being criminally investigated" and that there was a "***high probability of criminal prosecution***."

76. Former AAC Affiliate executive and director Fent invoked the rights afforded to him under the Fifth Amendment during his June 4, 2013 deposition in the *Benefield* Litigation. During the deposition, Mr. Fent's attorney specifically referred to the "Department of Justice's investigation."

77. A sworn declaration executed by former AAC employee Thalia Kirchwehn dated January 30, 2014 that was subsequently filed in the *Benefield* Litigation described how she was hired as an intake coordinator at AAC's California facility, A Better Tomorrow. Ms. Kirchwehn's declaration stated, *inter alia*, that:

I was trained for this work by Jerrod Menz…. I worked at the ABTTC call center, which was located at ABTTC's central facility on Murietta, California, where the corporate offices were also located. I understood that Mr. Menz was the manager of the call center. He had an office in the same building, and he was in the call center every day that I worked there. He was actively involved in training, overseeing, and instructing me and other intake coordinators.

Intake work at ABTTC was a high-pressure environment, with a "boiler-room" atmosphere. Intake coordinators had monthly intake quotas that had to be met or we would be fired. Mr. Menz personally pressured the intake staff to fill empty beds at the houses, and to close each potential sale. We were pressured to get potential clients to commit to the program as soon as possible, preferably during the initial telephone conversation. We were urged to try and get credit card numbers before they hung up.

I was expressly instructed by Mr. Menz [] to offer potential clients anything they asked for – homeopathic treatment, gym, spa, pool, recreation, beach, 24-hour medical care, doctors or psychiatrists on staff, mediations – anything the client wanted in terms of rehab services. I was also instructed by Mr. Menz [] to tell callers that ABTTC would handle whatever type of addiction that they were dealing with, that whatever problem they described was very serious, and that they needed treatment immediately. I was instructed to "move mountains" to get clients into the treatment center.

During my employment with ABTTC…I learned that…most house managers were former addicts, many of whom were only six months sober, and who lived in the ABTTC houses rent-free. Mr. Menz stated to me that he hires people cheap, who have very little sober time, in exchange for rent, and that is how he makes all his money. It was my understanding that none of the people who staffed the ABTTC residential treatment facilities, including the detox houses, were medical professionals.

…I had become aware that many of the services and amenities I was instructed to offer potential clients were not actually available, and the intake staff was expected to lie to people who called to inquire about services offered.

* * *

I am not aware of any potential client ever being turned away by anyone at ABTTC because of his or her medical condition. I was expressly instructed by Mr. Menz [] that if a caller brought up any type of medical issue, to tell them that ABTTC could handle it.

* * *

> At various times, Mr. Menz stated to me, "We're dealing with drug addicts and alcoholics, this is rehab, people die." He once made such a statement to me right after boasting, "I have a team in Washington and a team, of attorneys. No one's ever going to win any lawsuit because these are drug addicts and alcoholics, so who are they going to believe – a drunk or me?...I am tied in with the lobbyists for the industry, ***I'm untouchable***."

#### 4. The Insider Defendants Consummate the IPO

78. AAC sold 5 million shares of common stock to public investors pursuant to its IPO on October 1, 2014 at $15 per share. Shares were sold pursuant to the Registration Statement and began to trade on October 2, 2014. The Registration Statement described AAC as "a leading provider of inpatient substance abuse treatment services for individuals with drug and alcohol addiction. As of August 31, 2014, we operated six substance abuse treatment facilities located throughout the United States, focused on delivering effective clinical care and treatment solutions across our 467 beds, which included 338 licensed detoxification beds."

79. In 2013, AAC spent roughly $13.5 million on advertising as well as an undisclosed amount on its direct sales teams. AAC's direct marketing approach is unique to the substance abuse treatment industry and the Company's direct-to-consumer marketing is a major driver of patient acquisition, particularly as a large number of patients seek treatment outside the area where they reside. AAC spends its marketing budget on a wide variety of "customer-acquisition" vehicles, including television, print media, and the internet and runs a 24-hour call center at its corporate headquarters to respond to customer calls.

80. At all relevant times, AAC aggressively solicited "clients" like Mr. Benefield by paying large referral fees to third-party "intervention specialists" like "A Sober

Solution" to locate and place clients in AAC's detox houses. These "intervention specialists" referred clients to "Intake Coordinators" employed by AAC. Defendant Menz provided the script that they used to push the program to potential clients as alleged in ¶77, *supra*.

81. Subsequent to the IPO, Defendant Cartwright now owns approximately 26.8% of AAC's common stock and Defendant Menz now owns approximately 24.2% of the Company's common stock. Defendants Cartwright and Menz, together, were "the selling stockholders in [the IPO], as each has granted the underwriters a 30-day option to purchase up to 250,000 and 250,000, respectively, of additional shares of common stock to cover over-allotments, if any."

82. On October 7, 2014, the underwriters exercised the over-allotment option, causing Defendant Menz to sell 250,000 shares at $13.95 per share for net proceeds of $3,487,500.00. Similarly, on or around October 7, 2014, the underwriters exercised the over-allotment option, causing Defendant Cartwright to sell 250,000 shares at $13.95 per share for proceeds of $3,487,500.00. On top of personally benefitting from the IPO, Defendants Menz and Cartwright have also used their authority and control over AAC's operations to enrich their own wives. For instance, purportedly "based on [AAC's] successful completion of an IPO and execution of other strategic, operational and growth initiatives in 2014, the Board exercised its permitted discretion under the 2014 Cash Incentive Plan to award Messrs. Cartwright and Menz the remainder of their 2014 maximum eligible bonus payments, or $1,018,283 and $615,781, respectively."

83. At the time of AAC's acquisition of Clinical Revenue Management Services, LLC ("CRMS") on April 15, 2014, for instance, Tina F. Cartwright, the spouse of Defendant

Cartwright, and Victoria Menz, the spouse of Defendant Menz, held 50% of the outstanding membership interests in CRMS. Ms. Cartwright received total consideration of $1.3 million, consisting of $250,000 in cash and 117,162 shares of common stock at a fair value of $8.54 per share. Ms. Menz received total consideration of $1.3 million, consisting of $250,000 in cash and 117,162 shares of common stock at a fair value of $8.54 per share. Subsequent to the CRMS acquisition, Ms. Cartwright remains as CEO of CRMS with an annual salary of $300,000.

84. The Board and Defendant Cartwright approved a cash incentive payment of $315,000 to Ms. Phillips based on her achievement during 2014 of individual goals previously established by Defendant Cartwright himself in connection with, *inter alia*, the Registration Statement used for the IPO.

**B. Defendants' Growth-by-Acquisition Strategy**

85. One of AAC's core business strategies during the Class Period was highly dependent on growing *via* acquisitions. The Company's Class Period SEC filings represented that AAC "[o]pportunistically pursue[s] treatment facility acquisitions…to expand and diversify our geographic presence and service offerings through facility acquisitions." After personally meeting with Defendants Cartwright and Manz, a March 13, 2015 research note by William Blair titled "Highlights from Recent Travels with Management," noted that: "[m]anagement was quite bullish about M&A opportunities in discussions with investors. In fact, the company believes that over a multiyear time frame, the company could add just as many beds through acquisitions as through its de novo development pipeline."

86. To take advantage of such opportunities, the Company's SEC filings highlighted a $125 million credit facility announced on March 9, 2015, which also has a

$75 million accordion feature if larger acquisitions arise. AAC's Credit Agreement, however, provided that Defendants would "[p]romptly and in any event within five (5) Business Days notify the Administrative Agent and each Lender…of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect." A "material adverse effect" was at all relevant times broadly defined in the Company's SEC filings as "any event, change or effect that … is, or would be reasonably likely to be materially adverse to [] the financial condition, business, assets, liabilities or results of operations of the Company."

87. The California criminal DOJ investigation was certainly a potential "material adverse effect" that might place AAC in violation of its Credit Agreement. This, in turn, could have harmed the Company's ability to continue to finance its Class Period acquisitions. Hence, while Defendants contemporaneously knew about the potential for a criminal charge against Defendant Menz and the AAC Affiliates since at least August 2013 – more than a year before AAC went public – they raised nearly $200 million from investors without ever disclosing the pending criminal investigation. Defendants' nondisclosure enabled AAC to fraudulently pursue a series of opportunistic acquisitions facilitated by their concealment of and misrepresentations concerning the California DOJ investigation.

88. Further, the Insider Defendants used artificially inflated shares of AAC's common stock to consummate the acquisitions. As a result, Defendants had to issue fewer shares of AAC's stock for the stock acquisitions and, because fewer shares were issued, the Company suffered less stock dilution. This, in turn, enabled the Company to enjoy artificially inflated earnings per share during the Class Period. An analyst report by

William Blair dated February 24, 2015 titled "Solid End to First Year As a Public Company; Development Pipeline Looks Robust," stated, for instance, that:

> AAC reported solid fourth-quarter results, which were above consensus expectations across the board. Total revenue registered at $37.2 million, a 34% year-over-year increase and above both our $35.4 million target as well as the Street's $35.7 million forecast. Adjusted EBITDA (the key profit metric we monitor for AAC) were $6.6 million, also above both our target of $5.2 million and the consensus forecast of $5.6 million. Lastly, the company reported earnings per share of $0.15, which also came in above the Street's $0.09 forecast.

89. The Company's core business strategy to grow by acquisition therefore led Defendants to inflate AAC's reported earnings during the Class Period by actively concealing the intensifying California DOJ investigation from analysts, investors and the sellers who accepted inflated shares of AAC stock as currency in the acquisitions identified above.

**C. The Company's Class Period Acquisitions**

90. On December 15, 2014 AAC signed an agreement to acquire substantially all of the assets and assume certain specified liabilities of Recovery First, Inc., a Florida entity providing rehabilitation services in the greater Fort Lauderdale area. The aggregate purchase price payable was $13.0 million in cash. The Company closed this acquisition on February 20, 2015.

91. On January 23, 2015, AAC signed a definitive agreement to acquire Clinical Services of Rhode Island, Inc., a provider of intensive outpatient substance abuse treatment services, for $665,000 in cash ***and*** approximately $1.3 million of artificially inflated restricted shares of AAC's common stock. The acquisition was completed on April 17, 2015.

92. On January 28, 2015, AAC signed a definitive agreement for the acquisition of an 84-bed hospital in Aliso Viejo, California for an aggregate of $13.5 million in cash. According to AAC's 2Q 2015 Form 10-Q, the acquisition was completed on April 1, 2015, with the intention of "converting the property into a chemical dependency recovery hospital."

93. On February 24, 2015, AAC completed the purchase of a property in Ringwood, New Jersey for aggregate cash consideration of $6.5 million, which AAC expected to develop into an inpatient facility with approximately 150 beds.

94. On April 17, 2015, the Company acquired certain assets of Clinical Services of Rhode Island, Inc., a provider of intensive outpatient substance abuse treatment services, for $0.7 million in cash ***and*** 42,460 of artificially inflated shares of AAC's common stock. At the time, the Company's share price was trading at approximately $31 per share.

95. On May 12, 2015, AAC filed a current report on Form 8-K containing a press release announcing that it had entered into an agreement to purchase substantially all of the assets and assume certain specified liabilities of The Oxford Centre, Inc. and its affiliates, for $35 million in cash. In a separate Form 8-K filing on August 10, 2015, AAC announced the transaction had been completed.

96. On July 2, 2015, AAC acquired Referral Solutions Group, LLC, a leading online publisher in the substance abuse treatment industry with a comprehensive portfolio of websites and marketing assets, for $32.5 million in cash ***and*** 540,193 of artificially inflated shares of AAC's common stock. At the time of the acquisition, the Company's share price was trading at a Class Period high $44.75 per share.

97. Also on July 2, 2015, AAC acquired Taj Media, LLC, a premier digital marketing agency with addiction treatment industry expertise, for $2.2 million in cash ***and*** 37,253 of artificially inflated shares of AAC's common stock. At the time of the acquisition, the Company's share price was trading at a Class Period high of $44.75 per share.

### D. Defendants' Materially False and Misleading Class Period Statements and Omissions

#### 1. The Registration Statement Contains Actionable Misleading Statements and Omissions

98. As alleged throughout herein, prior to the Class Period, Defendants either knew and/or were deliberately reckless in not knowing about the California DOJ investigation. Defendants knew about and/or were deliberately reckless in not knowing that on August 29, 2013 DAG Gold, for instance, warned that "criminal charges will be filed" in connection with Mr. Benefield's death at an AAC facility. Defendants also knew about and/or were deliberately reckless in not knowing about the numerous other filings in the *Benefield* Litigation by the AAC Affiliates, Defendants Menz and Cartwright and former and current AAC employees acknowledging the existence of the California DOJ investigation.

99. The first day of the Class Period commences on October 2, 2014. Under "Legal Proceedings," the Registration Statement the SEC declared effective that day misrepresented that:

> From time to time, we may be engaged in various lawsuits and legal proceedings in the ordinary course of our business. Except as described below, we are currently ***not aware of any legal proceedings*** the ultimate outcome of which, in our judgment based on information currently available, would have a material adverse effect on our business, financial condition or results of operations.

100. As further evidence of Defendants' fraudulent course of business conduct, immediately below this material misrepresentation, AAC selectively disclosed its involvement in two relatively minor civil actions: (i) on February 3, 2014, the Company filed an action against James D. Bevell in this District alleging breach of contract and tortious interference with business practices arising out of Mr. Bevell's breach of his non-compete agreements; and (ii) on September 4, 2013, Horizon Blue Cross Blue Shield of New Jersey filed an amended complaint in the Superior Court of New Jersey against several defendants, including one of AAC's subsidiaries. Defendants disclosed these two relatively minor civil cases while simultaneously concealing the California DOJ's active and intensifying criminal investigation.

101. The Registration Statement then also misrepresented that Defendants were "***not aware of any material pending or threatened investigations involving allegations of wrongdoing***." In response to Defendants' material misrepresentations and omissions, AAC's shares rose over 27% on October 2, 2014 in a single day on huge volume of over 2.7 million shares traded as investors invested in AAC unaware of the ongoing and intensifying California DOJ investigation.

102. The statements identified in ¶¶99-101, *supra*, were materially false and misleading when made because, at the time they were made, the Insider Defendants either knew or deliberately disregarded that: (i) the California DOJ was investigating Defendant Menz, the AAC Affiliates and other AAC employees; (ii) the California DOJ investigation was "nearing completion;" (iii) DAG Gold informed Defendants Menz and Cartwright and the AAC Affiliates that the California DOJ "anticipate[d] that criminal charges will be filed;" (iii) Defendants Cartwright and Menz and the California DOJ filed documents in the

*Benefield* Litigation demonstrating their knowledge of the criminal investigation; (iv) Defendant Menz's counsel expressed her intention to have Defendant Menz invoke his Fifth Amendment rights in the *Benefield* Litigation, while Messrs. Fent and McCausland did invoke their Fifth Amendment rights in the *Benefield* Litigation because they each were aware of the parallel California DOJ criminal investigation. Defendants omitted these material facts from disclosure which were necessary to make the statements made in ¶¶99-101 not misleading.

103. Next, the Registration Statement also misleadingly referred to certain potential "Risks Related to Our Business" that Defendants knew had already materialized because the California DOJ investigation was "nearing completion" and DAG Gold warned in August 2013 that he "anticipate[d] that criminal charges will be filed:"

- Any disruption in our national sales and marketing program would have a material adverse effect on our business, financial condition and results of operations.

- If we fail to comply with the extensive laws and government regulations impacting our industry, we could suffer penalties, be the subject of federal and ***state investigations*** and potential claims and legal actions by clients, employees and others or be required to make significant changes to our operations, which may reduce our revenues, increase our costs and have a material adverse effect on our business, financial condition and results of operations.

104. The Registration Statement also deceptively provided the following additional potential "Risk Factors" regarding AAC that had already materialized, including the "***risk of governmental investigations*** and lawsuits or other claims against us and our physicians and professionals arising out of our day to day business operations, including, without limitation, ***client treatment at our facilities***" as set forth below:

We believe our national sales and marketing program provides us with a competitive advantage compared to treatment facilities that primarily target local geographic areas and use fewer marketing channels to attract clients. ***If any disruption occurs*** in our national sales and marketing program for any reason or if we are unable to effectively attract and enroll new clients to our network of facilities, our ability to maintain census could be adversely affected, which would have a material adverse effect on our business, financial condition and results of operations.

*       *       *

Our Second Amended and Restated Credit Facility (the "Credit Facility") imposes restrictions that could impede our ability to enter into certain corporate transactions, as well as increases our vulnerability to adverse economic and industry conditions, by limiting our flexibility in planning for, and reacting to, changes in our business and industry.

*       *       *

In addition, our Credit Facility requires us to meet certain financial covenants. The restrictions may prevent us from taking actions that we believe would be in the best interests of our business and may make it difficult for us to successfully execute our business strategy or effectively compete with companies that are not similarly restricted…. ***The breach of any of these covenants or restrictions could result in a default under the Credit Facility***, which could result in the acceleration of our debt. In the event of an acceleration of debt, we could be forced to apply all available cash flows to repay such debt and could be forced into bankruptcy or liquidation.

*       *       *

***As a provider of treatment services, we are subject to governmental investigations and potential claims and legal actions by clients, employees and others, which may increase our costs and have a material adverse effect on our business, financial condition and results of operations***. [Emphasis in original.]

We and others in our industry are exposed to the ***risk of governmental investigations*** and lawsuits or other claims against us and our physicians and professionals arising out of our day to day business operations, including, without limitation, client treatment at our facilities and relationships with healthcare providers that may refer clients to us. Addressing any investigations, lawsuits or other claims may distract management and divert resources.

*       *       *

> The expertise and efforts of our key executives, including our chief executive officer, ***president*** [Menz], chief operating officer, chief financial officer and general counsel, and other key members of our facility management personnel and sales staff are ***critical*** to the success of our business…. The loss of the services of one or more of our key executives or of a significant portion of our facility management personnel or sales staff could significantly undermine our management expertise and our ability to provide efficient, quality healthcare services at our facilities. Furthermore, if one or more of our key executives were to terminate employment with us and engage in a competing business, we would be subject to increased competition, which could have a ***material adverse effect*** on our business, financial condition and results of operations.

105. The statements identified in ¶¶103-104 above were materially false and misleading when made, and omitted from disclosure material facts necessary to not make the statements made misleading because at the time these statements were made the Insider Defendants either knew, or deliberately disregarded, that: (i) the California DOJ was investigating Defendant Menz, the AAC Affiliates and other AAC employees; (ii) the California DOJ investigation was "nearing completion;" (iii) in August 2013, DAG Gold informed Defendants Menz and Cartwright and the AAC Affiliates that he "anticipate[d] that criminal charges will be filed" in connection with Mr. Benefield's death at an AAC facility; (iv) Defendants Cartwright and Menz and the California DOJ filed documents in the *Benefield* Litigation demonstrating their knowledge of the criminal investigation; (v) Defendant Menz's counsel expressed her intention to have Defendant Menz invoke his Fifth Amendment rights in the *Benefield* Litigation, while Messrs. Fent and McCausland did invoke their Fifth Amendment rights because they each were aware of the parallel California DOJ criminal investigation; (vi) criminal charges could harm the Company's branding and marketing efforts; (vii) criminal charges could negatively impact the Company credit facility; and (viii) criminal charges could result in the loss of Defendant Menz and the

potential closing of the AAC Affiliates. Defendants also omitted these material facts from disclosure which were necessary to make the statements made in ¶¶103-104 not misleading.

106. The Registration Statement also acknowledged that:

> We derive a significant portion of our revenues from three treatment facilities located in ***California***, Nevada and Texas. These treatment facilities accounted for 76.5% of our total revenues in 2013 and 81.5% for the six months ended June 30, 2014…. If any event occurs that would result in a complete or partial shutdown of any of these facilities…such event could lead to decreased revenues and/or higher operating costs, which could have a material adverse effect on our revenues, profitability and cash flows.

107. The statements identified in ¶106 above were materially false and misleading when made, and omitted from disclosure material facts necessary to not make the statements made misleading for the same reasons set forth in ¶105, *supra*.

### 2. The Company's 4Q 2014 Quarterly Report Contains Actionable Misleading Statements and Omissions

108. On November 12, 2014, AAC filed its Form 10-Q with the SEC which again misrepresented that "we are currently not aware of any legal proceedings the ultimate outcome of which, in our judgment based on information currently available, would have a material adverse effect on our business, financial condition or results of operations."

109. The statement identified in ¶108 above was materially false and misleading when made, and omitted from disclosure material facts necessary to not make the statement made misleading for the same reasons set forth in ¶105, *supra*.

### 3. The Company's 2014 Annual Report Contains Actionable Misleading Statements and Omissions

110. On March 11, 2015, AAC filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2014. The Annual Report represented that one of the "primary competitive factors affecting our business" is "reputation and brand recognition."

AAC again misrepresented therein that "we are currently not aware of any legal proceedings the ultimate outcome of which, in our judgment based on information currently available, would have a material adverse effect on our business, financial condition or results of operations."

111. The Annual Report further represented that:

> In recent years, there have been heightened coordinated ***civil and criminal enforcement efforts*** relating to the healthcare industry by both federal and state government agencies….
>
> We believe we are in substantial compliance with all applicable laws and regulations and are ***not aware of any*** material pending or threatened investigations involving allegations of wrongdoing. While no such regulatory inquiries have been made, compliance with such laws and regulations can be subject to future government review and interpretation, as well as significant regulatory action including fines, penalties and exclusion from government health programs.

112. The statements identified in ¶¶110-111 above were materially false and misleading when made, and omitted from disclosure material facts necessary to not make the statements made misleading for the same reasons set forth in ¶105, *supra*.

113. While concealing the criminal investigation in the Annual Report, the Company did reveal the same two relatively minor civil actions described in ¶100, *supra*.

114. The Annual Report also contained several risk disclosures that were materially false and misleading because the risks warned of were already known to Defendants to have materialized. The misleading risk factors represented that:

> ***Our revenues, profitability and cash flows could be materially adversely affected if we are unable to operate certain key treatment facilities, our corporate office or our laboratory facility.*** [Emphasis in original.]
>
> We derive a significant portion of our revenues from three treatment facilities located in ***California***, Nevada and Texas. These treatment facilities accounted for 79.4% of our total revenues in 2014 and 76.5% in 2013. It is likely that a small number of facilities will continue to contribute a significant portion of

our total revenues in any given year for the foreseeable future. Additionally, we have a centralized corporate office that houses our accounting, billing and collections, information technology, marketing and call center departments and a high complexity laboratory facility that conducts quantitative drug testing and other laboratory services. ***If any event occurs*** that would result in a complete or partial shutdown of any of these facilities…such event could lead to decreased revenues and/or higher operating costs, which could have a material adverse effect on our revenues, profitability and cash flows.

***We rely on our multi-faceted sales and marketing program to continuously attract and enroll clients to our network of facilities. Any disruption in our national sales and marketing program would have a material adverse effect on our business, financial condition and results of operations.*** [Emphasis in original.]

…If any disruption occurs in our national sales and marketing program for any reason or if we are unable to effectively attract and enroll new clients to our network of facilities, our ability to maintain census could be adversely affected, which would have a material adverse effect on our business, financial condition and results of operations.

In addition, our ability to grow or even to maintain our existing level of business depends significantly on our ability to establish and maintain close working and referral relationships with hospitals, other treatment facilities, employers, alumni, employee assistance programs and other referral sources. We have no binding commitments with any of these referral sources. We may not be able to maintain our existing referral relationships or develop and maintain new relationships in existing or new markets. If we lose existing relationships with our referral sources, the number of people to whom we provide services may decline, which may adversely affect our revenues. Also, if we fail to develop new referral relationships, our growth may be restrained.

*  *  *

***Our operating flexibility is limited in significant respects by the restrictive covenants in our amended and restated credit facility, and we have breached such covenants in the past and may be unable to comply with such covenants in the future.*** [Emphasis in original.]

Our 2015 Credit Facility (as later defined) imposes restrictions that could impede our ability to enter into certain corporate transactions, as well as increases our vulnerability to adverse economic and industry conditions, by limiting our flexibility in planning for, and reacting to, changes in our business and industry.

*  *  *

…The breach of any of these covenants or restrictions could result in a default under the 2015 Credit Facility, which could result in the acceleration of our debt. In the event of an acceleration of debt, we could be forced to apply all available cash flows to repay such debt and could be forced into bankruptcy or liquidation.

* * *

***As a provider of treatment services, we are subject to governmental investigations and potential claims and legal actions by clients, employees and others, which may increase our costs and have a material adverse effect on our business, financial condition and results of operations.*** [Emphasis in original.]

…Addressing any investigations, lawsuits or other claims may distract management and divert resources, even if we ultimately prevail. Fines, restrictions and penalties imposed as a result of an investigation or a successful lawsuit or claim that is not covered by, or is in excess of, our insurance coverage may increase our costs and reduce our profitability. Our insurance premiums have increased year over year, and insurance coverage may not be available at a reasonable cost, especially given the significant increase in insurance premiums generally experienced in the healthcare industry.

* * *

***We depend heavily on key management personnel, and the departure of one or more of our key executives or a significant portion of our local facility management personnel or sales force could have a material adverse effect on our business, financial condition and results of operations.*** [Emphasis in original.]

The expertise and efforts of our key executives, including our chief executive officer, president, chief operating officer, chief financial officer and general counsel, and other key members of our facility management personnel and sales staff are critical to the success of our business…. The loss of the services of one or more of our key executives or of a significant portion of our facility management personnel or sales staff could significantly undermine our management expertise and our ability to provide efficient, quality healthcare services at our facilities. Furthermore, if one or more of our key executives were to terminate employment with us and engage in a competing business, we would be subject to increased competition, which could have a material adverse effect on our business, financial condition and results of operations.

* * *

***If we fail to comply with the extensive laws and government regulations impacting our industry, we could suffer penalties, be the subject of federal and***

> ***state investigations or be required to make significant changes to our operations, which may reduce our revenues, increase our costs and have a material adverse effect on our business, financial condition and results of operations.*** [Emphasis in original.]
>
> * * *
>
> Failure to comply with these laws and regulations could result in the imposition of significant civil or criminal penalties, loss of license or certification or require us to change our operations, which may have a material adverse effect on our business, financial condition and results of operations.

115. The statements identified in ¶114 above were materially false and misleading when made, and omitted from disclosure material facts necessary to not make the statements made misleading because at the time these statements were made the Insider Defendants either knew, or deliberately disregarded, that: (i) the California DOJ was investigating Defendant Menz, the AAC Affiliates and other AAC employees; (ii) the California DOJ investigation was "nearing completion;" (iii) DAG Gold informed Defendants Menz and Cartwright and the AAC Affiliates that he "anticipate[d] that criminal charges will be filed;" (iv) Defendants Cartwright and Menz and the California DOJ filed documents in the *Benefield* Litigation demonstrating their knowledge of the criminal investigation; (v) Defendant Menz's counsel expressed her intention to have Defendant Menz invoke his Fifth Amendment rights in the *Benefield* Litigation, while Messrs. Fent and McCausland did invoke their Fifth Amendment rights because they each were aware of the parallel California DOJ criminal investigation; (vi) criminal charges could harm the Company's branding, hospital and patient referral and marketing efforts; (vii) criminal charges could negatively impact the Company credit facility; and (viii) criminal charges could result in the loss of Defendant Menz and the potential closing of the AAC Affiliates. Defendants omitted these material facts from disclosure which were necessary to make the statements made in ¶114 not misleading.

#### 4. The Company's 1Q 2015 Quarterly Report Contains Actionable Misleading Statements and Omissions

116. On May 5, 2015, AAC filed its Quarterly Report on Form 10-Q with the SEC for 1Q 2015 which misrepresented that "we are currently not aware of any legal proceedings the ultimate outcome of which, in our judgment based on information currently available, would have a material adverse effect on our business, financial condition or results of operations."

117. This statement was materially false and misleading when made for the same reasons set forth in ¶115, *supra*.

#### 5. Defendants Cartwright and Manz Made Knowingly False Representations about AAC's Internal Controls

118. The Company expressly assured investors in its Annual Report on Form 10-K and its Quarterly Report on Form 10-Q filed during the Class Period that CEO Cartwright and CFO Manz, as the Company's senior financial officers, had "conducted an evaluation…of the effectiveness of [AAC's] disclosure controls and procedures" and "[b]ased on [that] evaluation…concluded that [AAC's] disclosure controls and procedures were effective" "as of the end of the period covered by this report." Separately, they signed Sarbanes-Oxley Act of 2002 Certifications representing, in relevant part, that:

> 1. I have reviewed this Quarterly Report on Form 10-Q of AAC Holdings, Inc.;
>
> 2. Based on my knowledge, this report ***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

119. The statements identified in ¶118 above were materially false and misleading when made, and omitted from disclosure material facts necessary to make the statements made not misleading because at the time they were made: (i) Defendants Cartwright and Manz either knew and/or recklessly disregarded that the Company's filings with the SEC had concealed the California DOJ investigation of Defendant Menz and the AAC Affiliates; (ii) Defendant Menz's counsel expressed her intention to have Defendant Menz invoke his Fifth

Amendment rights in the *Benefield* Litigation, while Messrs. Fent and McCausland did invoke their Fifth Amendment rights in the *Benefield* Litigation because they each were aware of the parallel California DOJ criminal investigation; and (iii) Defendant Cartwright submitted a declaration in the *Benefield* Litigation to preclude his deposition from going forward.

## VI. LOSS CAUSATION

120. When Defendants' prior material misrepresentations, omissions and misconduct were revealed and became apparent to investors, the price of AAC securities declined precipitously − as the prior artificial inflation in the price of the Company's securities was eliminated in a series of partial disclosures. As a result of their purchases of AAC securities during the Class Period, Plaintiffs and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

121. The economic losses suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of AAC's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misstatements, omissions and other fraudulent conduct were fully revealed. The timing and magnitude of AAC's securities price declines negate any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

122. At all relevant times, the material misrepresentations and omissions alleged in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during

the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about AAC's business, prospects and operations.

123. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of AAC and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period caused Plaintiffs and other members of the Class to purchase the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**A. July 29, 2015 Disclosure Events**

124. On July 29, 2015, after the close of the markets, AAC disclosed the July 21, 2015 California grand jury indictment, stating that "the indictment asserts charges against subsidiaries of AAC and two current and three former employees." AAC, however, failed to disclose that the indictment was for second-degree murder and dependent adult abuse and instead continued to mislead investors by stating that: "[w]e firmly believe that the California Department of Justice's case is without merit. We will vigorously defend the Company and each individual in court." The press release further misleadingly represented that the "Company is not currently aware of ***any*** evidence that the Company or any of the individuals charged were responsible for [Mr. Benefield's] death." The statement was misleading because, *inter alia*, Defendants were aware of substantial evidence demonstrating that Defendant Menz, Mr. Fent and others were responsible for Mr. Benefield's death. In fact, the Company settled the *Benefield* Litigation after Mr. Fent and Mr. McCausland each pled the Fifth presumably due to such evidence.

125. On July 29, 2015, AAC also released its 2Q 2015 financial results reporting an increase in revenues by 85% and an increase in client admissions by 62%, among other positive financial developments. AAC's earnings per share results beat analysts' estimates by almost double. While Defendants knew that the indictment had been filed on or around July 21, 2015, they actively delayed disclosing anything about it until July 29, 2015 so that the Company's positive 2Q 2015 results would mitigate the negative effect the announcement of the indictment would have on shares of the Company's common stock. In fact, after learning about the indictment on or around July 21, 2015, Defendants issued a press release on July 24, 2015 postponing their scheduled earnings conference call to July 29, 2015 so that the indictment's negative impact on AAC's share price would be reduced by the Company's announcement of its positive 2Q 2015 earnings.

126. On these partial, mixed disclosures, AAC's stock price declined by $1.58 per share, or 4% on July 30, 2015.

**B. August 1, 2015 Disclosure Event**

127. On August 1, 2015, the Company hosted an earnings conference call for investors and analysts where Defendant Cartwright claimed that, while he was "just now having the opportunity to review [the six page] indictment," he "firmly believe[d] that the California Department of Justice case is without merit." Defendant Cartwright's denial was designed to and did maintain the artificial inflation in the Company's share price and failed to disclose that several AAC employees had previously invoked their Fifth Amendment rights in the *Benefield* Litigation.

### C. August 3, 2015 Disclosure Events

128. On August 3, 2015, AAC disclosed that Defendant Menz and the AAC Affiliates were indicted for second-degree murder and dependent adult abuse. After representing that the allegations were "legally and factually unfounded," AAC conceded that "if the defendants were to be convicted; however, the loss could be material." The Form 10-Q also added that:

> Defending ourselves against the indictment could potentially entail costs that are material and could require significant attention from our management. If the defendants were to be convicted of the crimes alleged in the indictment, potential penalties could include fines, restitution, conditions of probation and other remedies…. Regardless of the outcome of the indictment, the publicity and potential risks associated with the indictment could negatively impact the perception of our Company by clients, investors and others. The consequences of the current criminal proceeding, as well as consequences of any future governmental investigation or lawsuit of any related or unrelated matter, could have a material adverse effect on our business and results of operations.

129. On August 3, 2015 *TheStreet* issued a report entitled "How Murder Charges Could Hurt AAC Holdings" which reported in pertinent part that:

> The problem here could hardly be any worse. On the same day earnings were released, the California Department of Justice indicted several current and former AAC employees over the death of a patient in 2010. The current employees are Jerrod Menz, the company's president and a member of the board, and Meg Dean, an operations director. The charge against these employees: murder.
>
> The company said Menz has stepped down from his roles while Dean will remain in her current position.
>
> AAC went public in October 2014 at a price of $15 a share, and the stock quickly tripled to more than $45 based on continued strong results.
>
> Last week's unwanted publicity has the potential to see the company completely unravel. Even though the company has several quarters of very strong results, investors should not be surprised to see the stock retest the IPO level of $15 as the consequences of these legal troubles manifest themselves.
>
> There are several major problems here that are likely to put severe pressure on the stock going forward.

**Problem No. 1**: Forterus (a unit of AAC Holdings) is named in the indictment. It is clear that California is going after the company, not just the individuals. The likely goal will be to put the company out of business. In reality, an ultimate conviction is not even necessary. The damage done by the indictment may be enough to see the Forterus unit shut down on its own. This is exactly what we saw following indictments of companies such as Arthur Andersen and Drexel Burnham Lambert. A conviction was not even necessary. This is very important because Forterus accounts for 107 beds, nearly 20% of AAC's total of 560.

**Problem No. 2**: ***lack of disclosure***. On its earnings call last week, CEO Michael Cartwright acknowledged the death of a patient in 2010. He also stated that the company had previously entered into a confidential settlement with the family of the victim. Yet none of this had ever been disclosed to investors prior to the public news of the criminal indictment. According to a report prepared for the California Senate Rules Committee in September 2012, there were other patient deaths at company facilities. These were not disclosed to investors in the IPO prospectus or in any subsequent Securities and Exchange Commission filings. The prospect for criminal charges in these deaths was never disclosed to investors. It certainly should have been. This lack of disclosure creates the possibility of massive lawsuits from both equity investors and lenders.

**Problem No. 3**: ***massive negative publicity***. It will now be the case that anyone who searches for information on addiction treatment will find out that its Forterus unit and its president were indicted for murder. That is going to be horrific for business. As we saw following the Whole Foods Market price-gouging scandal, the financial impacts of negative publicity can be substantial and are often felt immediately. Many potential addiction patients will simply go someplace else which doesn't have this massive negative publicity.

**Problem No. 4**: ***funding problems***. AAC is a very standard roll-up. The company is entirely dependent upon new acquisitions to drive growth. Without acquiring more and more beds (and then filling those beds) the company will see its results flatline. The massive overhang of murder charges against the president and the news of multiple patient deaths will make it more difficult for the company to raise money to fund acquisitions. It may also make potential acquisition targets less willing to be acquired by AAC. Without the ability to maintain a very high rate of growth, AAC quickly becomes a $10-15 stock.

**Problem No. 5**: ***additional indictments***. As stated before, that 2012 report for the California Senate Rules Committee cited multiple patient deaths at facilities that are now part of AAC. Yet so far we have seen only one indictment. This raises the possibility that we will see even more criminal indictments going forward.

**Problem No. 6**: Convictions are very likely. When a felony case goes to trial in California, convictions are highly likely. According to past data from the

> California Judicial Council, the conviction rate is north of 80%. California simply doesn't bring cases to trial unless they think they are a high-probability win.
>
> Following the murder indictment, it looks as if AAC's troubles may now be just beginning. There will no doubt be additional legal headaches and expenses, along with potential lawsuits over nondisclosure. There will be a very visible trial. There will be significant lost revenue and lost expansion opportunities.
>
> In a statement, AAC said Wednesday that it firmly believes the California Department of Justice's "case is without merit" and that the "charges are legally and factually unfounded."
>
> The statement also said, "The Company is not currently aware of any evidence that the Company or any of the individuals charged were responsible for the resident's death."

130. AAC's stock price fell again on August 3, 2015 in response to these developments, declining $5.22 per share, or 14%.

131. Then, on the morning of August 4, 2015, *Seeking Alpha* published the report by *Bleecker*. In addition to the death of Mr. Benefield, for which Defendant Menz and the AAC Affiliates were indicted, *Bleecker* reported about seven additional previously undisclosed deaths at other AAC treatment facilities in California and Florida as recently as 2014.

132. The *Bleecker* report as published on *Seeking Alpha* titled "American Addiction Centers: Even More Undisclosed Deaths and the Start of Real Problems" summarized numerous new facts and developments about AAC and Defendant Menz, including that:

- AAC continues to deceive patients, investors and analysts about the extent of and details of patient deaths.
- At least 8 undisclosed patient deaths in California and Florida, as recent as 2014.
- Details on more deaths, almost all from prescription drugs dispensed by AAC.
- Dispensing of controlled medications by low-wage, unlicensed employees from 'house supply' of drugs without prescriptions.

- Ongoing pattern of illegal behavior led to patient deaths, and continues now despite patient deaths.

The *Bleecker* report went on to describe how:

> AAC Holdings, also known as American Addiction Centers (NYSE:AAC) continues to deceive patients, investors and analysts about the extent of and the details of multiple patient deaths that have been occurring in its facilities as recently as 2014. First, AAC goes to great lengths to cover up the deaths. In most cases, no one knows that they have even happened. When found out, AAC then tries to make the deaths appear as if they were from natural causes in an attempt to avoid liability for negligence.
>
> Last week, there was a public criminal indictment of AAC's president, Jerrod Menz, in the death of Gary Benefield, who will be referred to as Patient #1 in the rest of this article. As a result, AAC was forced to disclose some details in this one death. However, AAC now insists that the death was due to natural causes. We will see below that this is demonstrably not the case and that this will be easily proven in a court of law. Beyond this, AAC continues to fail to disclose any details in seven (7) additional deaths which have occurred as recently as 2014.
>
> AAC only made this disclosure on its quarterly earnings call. AAC's quarterly results were incredibly strong, but the stock has already begun to sell off based on this news. But in reality, it now looks as if things may actually be far worse than they already appear.
>
> There was some very relevant information which was left out by AAC management.
>
> First, the specific charge leveled was "murder," the most serious charge that could have come up. That news was only revealed by the press one day later, and not by AAC.
>
> Second, not only was president Jerrod Menz (who has since resigned, but is still working with the company) indicted, but also the company's Forterus unit was indicted as an organization. Clearly you can't put the company in jail, but you can put it out of business. Forterus is the largest AAC division and is responsible for nearly 20% of AAC's revenues.
>
> Third, three independent medical doctors cited the actions of Forterus staff as having directly caused the death of the patient - it was not natural causes.
>
> AAC has stated that the patient died of "natural causes." This is clearly not the case. Based on the facts below, Forterus and Mr. Menz ran an organization which repeatedly and consistently had low wage unlicensed employees (former addicts

hired by Forterus) dispense controlled medications to patients without prescriptions. Medications were taken from a "house supply" of drugs. According to the independent medical examiner, this practice directly resulted in the death of Mr. Benefield (and others). Forterus also made it a practice to aggressively recruit unsuitable patients who had acute medical needs which could not be met by the company. This also directly resulted in multiple patient deaths. Together, it is these practices which are the basis of the "murder" charge against AAC's president, Jerrod Menz, and its director of operations, Meg Dean.

So far, there have been at least seven (7) additional undisclosed deaths of patients at AAC facilities in California and Florida. Some of these have occurred as recently as 2014. None of these has been disclosed by AAC to investors, to prospective patients or to analysts.

133. Also, in a section called "Criminal recruiting practices," *Bleecker* published numerous filings from the *Benefield* Litigation that Defendants had concealed from investors in the IPO and thereafter throughout the Class Period, including, *inter alia*, that:

AAC has made it a practice to deliberately and aggressively recruit new patients ***at all costs***, even when it means jeopardizing lives of at-risk patients. The facility purported to provide drug/alcohol detox; however the company is in no way staffed or equipped to handle such medically fragile patients.

Thalia Kirchwehm [sic] was a former intake specialist at the AAC unit. She quit over frustration with the recruiting tactics required by CEO Jerrod Menz.

According to Ms. Kirchwehm's [sic] deposition.

- Intake work was a high pressure environment, with a 'boiler room' atmosphere

- I was expressly instructed by Mr. Menz [the current CEO] and Ms. Scarella to offer potential clients anything they asked for – homeopathic treatment, gym, spa, pool, beach, 24 hour medical care, doctors or psychiatrists on staff, medications – anything the client wanted in terms of rehab services

- Mr. Menz took me to some of the different residential facilities while he was explaining the goals of the intake department. I learned that the house managers were handling the detox program, and that most house managers were former addicts, many of whom were only 6 months sober.

- Mr. Menz stated to me that he hires people cheap, who have little sober time, in exchange for rent, and that is how he makes all his money.

- I started getting uncomfortable because I had become aware that many of the services and amenities I was instructed to offer were not actually available, and the intake staff was expected to lie to people who called to inquire about the services offered.

Again, keep in mind that these are her official statements from her court deposition under penalty of perjury.

From the court documents and Ms. Kirchwehm's [sic] declaration it should be clear that AAC was telling patients that it could provide a level of medical-care that it's not equipped to handle, a practice which continues today.

134. After the disclosure of the new facts and documents contained in the *Bleecker* report – including a copy of the DAG Gold Declaration – AAC's stock plunged on August 4, 2015, falling by $12.90 per share, or 39%, thereby ending the Class Period.

## VII. RELEVANT POST CLASS PERIOD EVENTS

135. On August 5, 2015, *Forbes* published an article titled "AAC Holdings' Lawyers Knew About Criminal Investigation in 2013" reporting, in pertinent part, that:

> In a separate civil lawsuit, lawyers for A Better Tomorrow Treatment Centers and AAC Holdings co-founder and former president ***Jerrod Menz admitted that they knew about the criminal investigation*** into the death of Gary Benefield. In April 2013, lawyers for Menz, A Better Tomorrow and Forterus, a unit of AAC Holdings, filed a motion for order grant of use immunity, trying to stop lawyers for the widow of Gary Benefield, Kelly Benefield, from conducting depositions due to the ongoing criminal investigation.
>
> "Since some (or all) of the defendants may be the target of a criminal investigation by the Department of Justice – Bureau of Medi-Cal Fraud and Elder Abuse, each of the individual defendants and the employees/former employees of the corporate defendants may plead the Fifth Amendment at their respective depositions," lawyers for, Menz, Forterus and A Better Tomorrow wrote. "However, doing so will severely prejudice each of the defendants in this civil action."
>
> As part of the effort to stop the depositions, a lawyer for A Better Tomorrow and Forterus declared that she had been provided with information in March 2013 that

> that the California Department of Justice "is apparently conducing [sic] an investigation with respect to one or more of the defendants in this action."
>
> Calfornia [sic] Attorney General Kamala Harris successfully opposed the motion in May 2013, saying in a court filing in the civil case that stopping the depositions "would unduly hamper an anticipated criminal prosecution involving one or more civil defendants." As part of this filing, Hardy Gold submitted a declaration saying the criminal investigation was into the death of Gary Benefield. The depositions started to take place shortly after. For example, a former A Better Tomorrow employee, James Andrew Fent, pleaded the Fifth in a deposition that occurred on June 4, 2013. The company ended up settling the wrongful death lawsuit that was filed by Kelly Benefield.
>
> Last week, prosecutors in the California attorney general's office unsealed an indictment that accused Fent, [Defendant] Menz, two other individuals, A Better Tomorrow Treatment Centers and Forterus of murdering Benefield. The company has denied wrongdoing on behalf of itself and its employees and former employees. In a response to questions from *Forbes* about when it became aware of the criminal investigation, the company said in a statement last week it learned of the grand jury investigation into the death of Gary Benefield about ***six weeks ago.***

136. Although the Company reportedly admitted to *Forbes* that it became aware of the grand jury investigation at least six weeks prior to August 5, 2015, Defendants failed to make any such disclosure to its investors or to the market during that period.

137. On October 29, 2015, AAC hosted an earnings conference call for investors and analysts where Defendant Cartwright irresponsibly stated that Attorney General Kamala Harris was engaged in a "witch hunt" and that the indictments were "absolutely ludicrous." Defendant Cartwright also cynically informed investors that AAC had created a new website called "AACthetruth.com" with "detailed instructions on how to obtain court filings" in the California matter. After concealing the criminal investigation and *Benefield* Litigation for over two years, Defendant Cartwright also cynically added that he would "keep investors apprised of material developments" about the grand jury charges. Defendant Cartwright's efforts at "transparency,"

however, came at least two full years after he learned about the California DOJ criminal investigation and the *Benefield* Litigation.

138. The Company's most recent Quarterly Report on Form 10-Q dated November 10, 2015 now finally informs investors that:

> On July 29, 2015, the Superior Court of the State of California court unsealed a criminal indictment returned by a grand jury against our subsidiaries ABTTC, Inc. dba A Better Tomorrow Treatment Centers, Forterus, Inc. and Forterus Health Care Services, Inc., ***Jerrod N. Menz***, our former President and former member of our Board of Directors, as well as a current facility-level employee and three former employees. The indictment was returned in connection with a criminal investigation by the California Department of Justice and charged the defendants with second-degree murder and dependent adult abuse in connection with the death of a client in 2010 at one of our former locations. We believe the allegations are legally and factually unfounded and intend to contest them vigorously. Given the early stage of this proceeding, we cannot estimate the amount or range of loss if the defendants were to be convicted; however, ***such loss could be material***.

139. On November 12, 2015, the trial court overseeing the criminal proceedings in Riverside County held an extensive hearing on the demurrer previously filed by Defendant Menz and the AAC Affiliates. On December 10, 2015, the AAC Affiliates and Defendant Menz pleaded not guilty at their arraignment and the trial court denied their demurrer to the murder and adult dependent abuse charges that defendants filed on November 12, 2015.

140. Trial in *People of the State of Cal. v. McCausland, Menz, Forterus, Inc., et al.*, No. SWF 1501351 (Cal. Super. Ct., Riverside Cnty.) is currently scheduled for May 2016.

## VIII. CLASS ACTION ALLEGATIONS

141. Plaintiffs bring this matter as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired AAC securities between October 2, 2014, and August 3, 2015, inclusive. Excluded from the Class are Defendants, directors, and officers of AAC, as well as their families and affiliates.

142. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of February 2015, AAC had over 21 million shares of its common stock outstanding, owned by hundreds if not thousands of persons.

143. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the Exchange Act was violated by Defendants;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of AAC securities was artificially inflated during the Class Period; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

144. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

145. Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation and possess the necessary

financial resources to pursue this matter on behalf of the Class. Plaintiffs have no interests that conflict with those of the Class.

146. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE

147. As a result of the foregoing, the market for AAC's securities promptly digested current information regarding AAC from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of AAC's securities during the Class Period suffered similar injury through their purchase of AAC's securities at artificially inflated prices, and the *Basic* presumption of reliance applies.

148. Plaintiffs and the putative Class are also entitled to the *Affiliated Ute* presumption of reliance due to Defendants' failure to disclose material facts, *inter alia*, regarding the California DOJ criminal investigation and *Benefield* Litigation, information which Plaintiffs would have wanted to know and would have caused investors to avoid purchasing shares of AAC's securities at the prices they traded at during the Class Period.

149. At all relevant times, there existed a substantial likelihood that the disclosure of the omitted facts would have been viewed by a reasonable investor as having significantly altered the total mix of information made available to AAC's shareholders. The California DOJ investigation was also "hard information" that is and was at all relevant times objectively verifiable.

150. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's securities traded in efficient markets;

(d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiffs and other members of the Class purchased AAC's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f) At all relevant times, the markets for AAC's securities were efficient for the following reasons, among others: (i) AAC filed periodic public reports with the SEC; (ii) its shares traded on the NYSE – a presumptively efficient national secondary exchange; and (iii) AAC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services. Plaintiffs and the Class relied on the price of AAC's securities, which reflected all the information in the market, including the misstatements and material omissions by Defendants.

## X. NO SAFE HARBOR

151. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were

no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

152. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Insider Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AAC who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All the Defendants)

153. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

154. During the Class Period, Defendants disseminated or approved the false statements and omissions specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a

fraud and deceit upon those who purchased or otherwise acquired AAC securities during the Class Period.

156. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AAC's securities. Plaintiffs and the Class would not have purchased AAC's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and material omissions.

157. The Insider Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing AAC's true financial condition from the investing public and supporting the artificially inflated price of AAC's securities.

## SECOND CLAIM

**Violation of Section 20(a) of the Exchange Act**
**(Against the Insider Defendants)**

158. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

159. The Insider Defendants acted as controlling persons of AAC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Insider Defendants had the power and authority to cause or prevent AAC from engaging in the wrongful conduct complained of herein. The Insider Defendants were provided with or had unlimited access to the fraudulent SEC filings and other reports alleged by Plaintiffs to be misleading both prior to and immediately after

their publication, and had the ability to prevent the issuance of these materials or cause them to be corrected so as not to be misleading.

160. By reason of such conduct, the Insider Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI. PRAYER FOR RELIEF

WHEREFORE**,** Plaintiffs pray for relief and judgment, as follows:

1. Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class Classes as defined herein, and a certification of Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs' counsel as Class Counsel;

2. Awarding compensatory and punitive damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount proven at trial, including pre-judgment and post-judgment interest thereon;

3. Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4. Awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## XII. JURY DEMAND

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: February 29, 2016

Respectfully submitted,

**BARRETT JOHNSTON MARTIN & GARRISON, LLC**

By: /s/ *David W. Garrison*
David W. Garrison (No. 24968)
Jerry E. Martin (No. 20193)
Timothy L Miles (No. 21605)
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37214
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
*Liaison Counsel for Lead Plaintiffs*

**KAHN SWICK & FOTI, LLP**

By: /s/ *Ramzi Abadou*
Ramzi Abadou (admitted *pro hac vice*)
912 Cole Street, # 251
San Francisco, CA 94117
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

-and-

**KAHN SWICK & FOTI, LLC**
Lewis S. Kahn
Alexander L. Burns
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**KAPLAN FOX & KILSHEIMER LLP**
By: /s/ *Frederic S. Fox*
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
*Lead Counsel for Lead Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Consolidated Class Action Complaint for Violation of Federal Securities Laws* has been filed with the Clerk and served on the following via the Court's ECF filing system on February 29, 2016:

Britt K. Latham
Joseph B. Crace, Jr.
BASS, BERRY & SIMS (Nashville Office)
150 Third Avenue South
Suite 2800
Nashville, TN 37201
(615) 742-6200
Email: blatham@bassberry.com
Email: jcrace@bassberry.com

Jessica Perry Corley
John Latham
Lisa R. Bugni
ALSTON & BIRD LLP (Atlanta Office)
One Atlantic Center
1201 W Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000
Fax: (404) 881-7777
Email: jessica.corley@alston.com
Email: john.latham@alston.com
Email: lisa.bugni@alston.com

*Attorneys for defendants AAC Holdings, Inc., Jerrod N. Menz, and Michael T. Cartwright*

/s/ David W. Garrison
DAVID W. GARRISON
**BARRETT JOHNSTON**
**MARTIN & GARRISON, LLC**

**CERTIFICATION**

I, George Hopkins, Executive Director of Arkansas Teacher Retirement System ("ATRS"), hereby certify as follows:

1. I am authorized to make a certification on behalf of ATRS.

2. I have reviewed a complaint prepared against AAC Holdings, Inc. ("AAC") alleging violations of the securities laws and authorize the filing of the complaint and/or the filing of a lead plaintiff motion.

3. ATRS did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. ATRS is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial if necessary. ATRS fully understands the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act of 1995, specifically concerning its selection and retention of counsel and overseeing and directing the prosecution of the action on behalf of the class.

5. ATRS's transactions in AAC common stock, during the proposed class period, are set forth in Schedule, attached hereto.

6. ATRS sought to serve and serves or served as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this certification:

*In re Spectrum Pharmaceuticals, Inc., Securities Litigation*, No. 13-cv-00433 (D. Nev.)
*Anderson v. Spirit AeroSystems Holdings, Inc.*, No. 13-cv-02261 (D. Kan.)
*In re Vocera Communications, Inc. Securities Litigation*, No. 13-cv-03567 (N.D. Cal.)
*Ortuzar v. Francesca's Holding Group*, No. 13-cv-06882 (S.D.N.Y.)
*Arkansas Teacher Retirement System v. Bankrate, Inc.*, No. 13-cv-07183 (S.D.N.Y.)
*In re Quality Systems, Inc. Securities Litigation*, No. 13-cv-01818 (C.D. Cal.)
*In re DFC Global Corp. Securities Litigation*, No. 13-cv-06731 (E.D. Pa.)
*Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226 (N.D. Cal.)
*Rossy v. Merge Healthcare, Inc.*, No. 14-cv-00318 (N.D. Ill.)
*In re The Bancorp Inc. Securities Litigation*, No. 14-cv-00952 (D. Del.)
*In re Commvault Systems, Inc. Securities Litigation*, No. 14-cv-05628 (D.N.J.)
*State-Boston Retirement System v. Infoblox, Inc.*, No. 14-cv-02500 (N.D. Cal.)
*In re Five Below, Inc. Securities Litigation*, No. 15-cv-00094 (E.D. Pa.)
*In re Virtus Investment Partners, Inc. Securities Litigation*, No. 15-cv-01249 (S.D.N.Y.)
*Heller v. Vipshop Holdings Ltd.*, No. 15-cv-03870 (S.D.N.Y.)

7. ATRS sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws during the last three years where it either withdrew its motion or has not been appointed as of the date of this certification:

*Freedman v. St. Jude Medical, Inc.*, No. 12-cv-03070 (D. Minn.)
*Weber v. Groupon, Inc.*, No. 12-cv-10235 (N.D. Ill.)
*Construction Workers Pension Trust Fund – Lake County & Vicinity v. Navistar International Corp.*, No. 13-cv-02111 (N.D. Ill.)
*Mazzaferro v. Aruba Networks, Inc.*, No. 13-cv-02342 (N.D. Cal.)
*New York State Teachers' Retirement System v. General Motors Company*, No. 14-cv-11191 (E.D. Mich.)
*Jahm v. Bankrate, Inc.*, No. 14-cv-81323 (S.D. Fla.)
*Arkansas Teacher Retirement System v. Insulet Corporation*, No. 15-cv-12345 (D. Mass)

8. ATRS will not accept any payment for serving as a representative party on behalf of a class beyond its pro-rata share of any recovery, except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expense directly related to the representation of the class.

9. I declare under penalty of perjury that the foregoing is true and correct, executed on this 19th day of October, 2015.

George Hopkins
*Executive Director*
*Arkansas Teacher Retirement System*

## SCHEDULE

**ATRS's Transactions in AAC Holdings, Inc.'s Common Stock**
**Period: October 2, 2014 and August 3, 2015**

| Transaction Type | Trade Date | Shares | Price |
|---|---|---|---|
| BUY | 6/17/2015 | 3,927 | $42.9996 |
| BUY | 6/18/2015 | 3,439 | $43.4999 |
| BUY | 6/15/2015 | 2,692 | $42.3319 |
| BUY | 6/15/2015 | 2,161 | $42.2600 |
| BUY | 6/19/2015 | 1,530 | $43.8243 |
| BUY | 6/16/2015 | 1,145 | $42.9645 |
| BUY | 6/15/2015 | 522 | $42.1484 |
| BUY | 6/12/2015 | 283 | $42.9638 |
| BUY | 6/19/2015 | 213 | $43.7088 |
| BUY | 6/17/2015 | 88 | $42.9957 |
| BUY | 7/24/2015 | 1,850 | $38.1522 |
| BUY | 7/27/2015 | 3,150 | $38.1625 |
| BUY | 7/30/2015 | 3,047 | $38.9083 |
| BUY | 7/30/2015 | 1,219 | $37.4350 |
| BUY | 7/30/2015 | 10,634 | $37.4401 |

# CERTIFICATION PURSUANT TO SECURITIES LAWS

James P. Gills, M.D. (name) ("Movant") declares, as to the claims asserted under the federal securities law, that:

1. Movant has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws, Movant adopts the allegations of the complaint(s), and Movant retains the firm of Kahn Swick and Foti, LLC, to pursue such action on a contingent fee basis.
2. Movant did not purchase securities of **AAC Holdings, Inc.** at the direction of counsel or in order to participate in a private action under the federal securities laws.
3. Movant is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. During the Class Period, Movant has executed transactions in the securities of **AAC Holdings, Inc.** as follows. See attached Schedule.
5. In the last three years, Movant has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.
6. Movant will not accept payment for serving as a lead plaintiff beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 10/23/11, 2015

Movant Signature

JAMES P. Gills

Printed Name

**Transactions of James P. Gills in Securities of AAC Holdings, Inc.**

| Purchase Date | Price | Quantity |
| --- | --- | --- |
| 06/11/2015 | $44.85 | 10000 |