UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


| | |
|---|---|
| Dr. JOSEPH F. KASPER, Individually and on Behalf of All Others Similarly Situated,       Plaintiff,<br><br>vs.<br><br><br><br>AAC HOLDINGS, INC., et al.,       Defendants. | )<br>)<br>)<br>)<br>) No. 3:15-cv-00923<br>) (Consolidated)<br>) JUDGE CAMPBELL<br>) MAGISTRATE JUDGE NEWBERN<br>)<br>) |


## EXPERT REPORT OF CHAD COFFMAN, CFA



**October 18, 2016**

**Table of Contents**

**Page**

I.     **INTRODUCTION** ...................................................................................................**3**

II.    **QUALIFICATIONS** ............................................................................................**3**

III.   **SUMMARY OF OPINIONS** ...............................................................................**4**

IV.   **OVERVIEW OF AAC AND ALLEGATIONS** .................................................**5**

V.     **DISCUSSION OF RELIANCE ELEMENT** ....................................................**7**

VI.   *CAMMER* **FACTORS** ........................................................................................**9**

VII.  **APPLICATION OF EFFICIENCY FACTORS TO AAC COMMON STOCK**..............**11**

    A.     OVERVIEW.......................................................................................... 11

    B.     *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME ..................... 12

    C.     *CAMMER* FACTOR 2: ANALYST COVERAGE ................................................ 14

    D.     *CAMMER* FACTOR 3: MARKET MAKERS........................................................ 16

    E.     *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY......................................... 17

    F.     *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION................................ 18

    G.     ADDITIONAL FACTOR 1: MARKET CAPITALIZATION.................................... 28

    H.     ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ......................................... 29

    I.     ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP ............................... 30

    J.     ADDITIONAL FACTOR 4: AUTOCORRELATION .......................................... 30

VIII. **DAMAGES**.....................................................................................................**32**

IX.   **CONCLUSION** ...............................................................................................**33**

Case 3:15-cv-00923   Document 80-4   Filed 10/18/16   Page 2 of 63 PageID #: 2763

# I.  INTRODUCTION

1.      My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Lead Plaintiffs to examine and opine on whether the market for AAC Holdings, Inc. ("AAC" or the "Company") common stock ("AAC Common Stock") was efficient during the Class Period.[1] In addition, I have been asked to opine on whether the calculation of damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.      The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $600 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case. My qualifications are described below.

# II.  QUALIFICATIONS

3.      I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's in Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

---

[1] The putative Class Period identified in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") is from October 2, 2014 through August 3, 2015 (Complaint ¶ 2).

4.     I, along with several others, founded Global Economics Group in March 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.     My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.   SUMMARY OF OPINIONS

6.     After analyzing AAC Common Stock throughout the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for AAC Common Stock was efficient throughout the Class Period and that damages can be calculated on a class-wide basis. These opinions are based upon my analysis described below.

7.     The remainder of this report is organized as follows: **Section IV** of this report provides an overview of AAC' business operations and the allegations in this case. **Section V** discusses the reliance requirement and the "fraud on the market" theory. **Section VI** introduces

---

[2] Global Economics Group was formerly known as Winnemac Consulting, LLC.

4

the *Cammer* factors and other factors for evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for AAC Common Stock during the putative Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

8.     I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.     OVERVIEW OF AAC AND ALLEGATIONS

9.     AAC Holdings, Inc. was incorporated in Nevada in February 2014 and has its executive offices in Brentwood, Tennessee.[3] AAC Holdings described itself as follows in its Form 10-K for the period ending December 31, 2014:

> AAC Holdings, Inc. is a leading provider of inpatient substance abuse treatment services for individuals with drug and alcohol addiction. As of March 1, 2015, we operated seven residential substance abuse treatment facilities and one outpatient substance abuse treatment facility. Our substance abuse treatment facilities are located throughout the United States, focused on delivering effective clinical care and treatment solutions across our 560 beds, which includes 378 licensed detoxification beds… By applying a tailored treatment program based on the individual needs of each client, many of whom require treatment for a co-occurring mental health disorder, such as depression, bipolar disorder and schizophrenia, we believe we offer the level of quality care and service necessary for our clients to achieve and maintain sobriety.[4]

10.     The Company grew out of a residential treatment company founded in 2004 that was acquired by Forteurs, Inc. in 2008. After additional acquisitions, Forteurs became American Addiction Centers in 2012 and reorganized as AAC Holdings Inc. in 2014.[5] The Company had

---

[3] AAC Holdings 2014 10-K, p. 3.

[4] AAC Holdings 2014 10-K, p. 3.

[5] AAC Holdings 2014 10-K, pp. 3-4.

5

its initial public offering on October 1, 2014, issuing 5,000,000 shares at a price of $15.00.[6] Its shares trade on the NYSE under the ticker "AAC." As of March 1, 2015 the Company had approximately 900 employees.[7] AAC's revenues in Fiscal Year 2014 were $132.97 million.[8]

11. The Complaint alleges that from prior to the time of AAC Holdings' IPO, the Company failed to disclose that Defendant Menz (AAC's President at the time) and a subset of AAC's subsidiaries were under investigation by the California Department of Justice ("DOJ").[9] The California DOJ ultimately indicted Defendant Menz and others for second-degree murder and dependent adult abuse. This fact was directly contradicted by the Company's filings with the U.S. Securities and Exchange Commission, which affirmed that AAC Holdings was "not aware of any material pending or threatened investigations involving allegations of wrongdoing" and "not aware of any legal proceedings the outcome of which … would have material adverse effect on our business, financial condition or results of operations."[10]

12. The complaint further alleges that on July 29, 2015, AAC disclosed the July 21, 2015 California grand jury indictment and further disclosed on August 3, 2015 that Defendant Menz and the AAC Affiliates were indicted for second-degree murder and dependent adult abuse. Following these disclosures, AAC's shares allegedly plummeted, causing investor losses as the relevant truth concealed by the misstatements and/or omissions was revealed.[11]

---

[6] AAC Holdings Prospectus (Form 424(b)(4), filed October 2, 2014).

[7] AAC Holdings 2014 10-K, p. 3.

[8] AAC Holdings 2014 10-K, p. 35.

[9] Complaint ¶¶ 6-7.

[10] Complaint ¶ 10.

[11] Complaint ¶¶ 20-25.

6

## V.   DISCUSSION OF RELIANCE ELEMENT

13.   Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiffs' Section 10(b) claims. Lead Plaintiffs assert the "fraud on the market" theory of reliance in this matter. The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price), all purchasers implicitly rely on any material misrepresentations or omissions, since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic v. Levinson* and reaffirmed in *Halliburton II*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[12]

14.   The Supreme Court recently reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[13]

15.   As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the

---

[12] *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).

[13] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

7

market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and lack of disclosure by paying the inflated (deflated) price.

16. Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[14] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[15] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[16]

17. The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices

---

[14] To recognize the presumption of reliance, the Supreme Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id* at 247 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency. Indeed, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof. *See Halliburton II.*

[15] Eugene Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. Fin. 383 (1970).

[16] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

8

adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[17] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.[18]

18.   In the next section, I explain the factors that are regularly considered by courts in determining whether the market for a particular security is efficient.

## VI.   *CAMMER* FACTORS

19.   In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[19]

20.   The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency.[20] As articulated below, the adopted definition of efficiency is consistent with Fama's definition of

---

[17] *Basic,* 485 U.S. at 242.

[18] Indeed, *Halliburton II* sensibly makes clear that the standard is short of some idealized notion of semi-strong efficiency, but rather, "[t]o recognize the presumption of reliance, the Court explained, was not 'conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.' *Id.* The Court instead based the presumption on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" 134 S. Ct. at 2410 (internal citations omitted).

[19] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[20] *Cammer,* 711 F. Supp. at 1276, n.17.

9

"semi-strong" efficiency.[21] For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[22]

21.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have used beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics are determinative as to whether a particular market is efficient.

22.    In the subsequent sections, I evaluate each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1)

---

[21] Eugene Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. FIN. 383 (1970).

[22] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)) (emphasis added).

market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, and 4) autocorrelation (meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns).

## VII. APPLICATION OF EFFICIENCY FACTORS TO AAC COMMON STOCK

### A. OVERVIEW

23.     After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports my opinion that the market for AAC Common Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes each of the factors examined, both under *Cammer* and the additional factors considered by courts, providing empirical evidence in support of a finding that AAC Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays AAC Common Stock closing price and trading volume for each day throughout the Class Period.

24.     In summary, and as discussed more fully below, AAC Common Stock traded in an efficient market (indeed, it traded on the NYSE, which is widely recognized as an open and well-developed market). First, the average weekly trading volume of AAC Common Stock during the Class Period far exceeded benchmarks that courts have established. During the Class Period, the average daily trading volume for AAC Common Stock was approximately 177 thousand shares, which represents an average of 4.19% of outstanding shares turnover per week, higher than the average common stock traded on the New York Stock Exchange. Second, there were several securities analysts following and reporting on AAC. Third, AAC Common Stock was actively traded on the NYSE, fulfilling the *Cammer* factor regarding market makers. Fourth, AAC Common Stock had a sizeable market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Fifth, AAC Common Stock had a low bid-ask spread relative to other

exchange-traded stocks. Sixth, institutions, which are considered generally to be well-informed investors, held, on average, approximately 89% of the public float. Seventh, there was no evidence of autocorrelation during the Class Period. Finally, there was a strong cause-and-effect relationship between new Company-specific information and the market price of AAC Common Stock during the Class Period. These factors all support the conclusion that AAC Common Stock traded in an open, developed, and efficient market throughout the Class Period.

## B.  *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

25.    The first *Cammer* Factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[23]

26.    Volume as a fraction of shares outstanding is an important indicator of market efficiency. First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[24] Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects

---

[23] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[24] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45. Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) as cited by *Cammer*, 711 F. Supp. at 1276 n.17. Market depth refers to the number of shares that can be traded at quoted prices. A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).

information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[25]

27. AAC Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly turnover for AAC Common Stock was 4.19%, compared to 1.72% for the NYSE over the Class Period. **Exhibit 3** plots AAC Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[26] Indeed, the average *daily* volume during the Class Period was 177 thousand shares.

28. The volume of trading for AAC Common Stock supports the conclusion that the market for this security was efficient throughout the Class Period.

29. Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* Factor expressed in dollar terms.[27] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, AAC Common Stock's turnover velocity can be

---

[25] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

[26] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days (this may not follow the calendar week).

[27] Turnover velocity is simply the average turnover (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

13

compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for AAC Common Stock was 218%, compared with the NYSE average of 90% for the Class Period.[28] Thus, AAC Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NYSE, further supporting that it traded in an efficient market.

30.    In short, the relatively high trading volume in AAC Common Stock throughout the Class Period supports the conclusion that the market for AAC Common Stock was efficient.

## C. *CAMMER* FACTOR 2: ANALYST COVERAGE

31.    The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [relevant] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[29]

32.    Analyst coverage can be important confirmatory evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

33.    During the Class Period, there was analyst coverage for AAC. **Exhibit 4** shows that there were at least 36 reports by equity analysts from at least 7 separate firms throughout the Class Period.[30] These reports served the purpose of disseminating publicly available information

---

[28] Turnover velocity for the NYSE is calculated from data provided by the World Federation of Exchanges. *See* http://www.world-exchanges.org/home/.

[29] *Cammer*, 711 F. Supp. at 1286.

[30] I obtained AAC analyst reports from Investext. The number of analyst reports I identify is likely understated since a number of analyst reports are not available through third party data providers such as Investext.

14

along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The coverage of AAC by securities analysts supports the conclusion that AAC Common Stock traded in an efficient market throughout the Class Period.

34. Since 1989, when the *Cammer* decision was rendered, there has been a massive increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[31] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

35. Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the analyst coverage of AAC, there were many other sources of public information dissemination. For example, there was consistent public press regarding AAC. A database search for articles classified as related to AAC by Factiva over the short Class Period results in over 265 unique articles.[32] In addition, there were also numerous SEC filings available online at EDGAR at no out-of-pocket cost as well as various other sources

---

[31] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasingly popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (http://www.rss-specifications.com/ and http://www.rss-specifications.com/what-is-rss.htm).

[32] Based on a search for articles from "All Sources" with the company field set to "AAC Holdings Inc (AACHO) " or all articles containing the characters "AAC Holdings" for the period "October 2, 2014 – August 4, 2015." Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.

of public information available throughout the Class Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was ample supply of and demand for information regarding AAC in the public arena throughout the Class Period.

36.    In summary, the number of analyst reports and the public dissemination of news and other information regarding AAC, provides evidence of a robust and active market for public information about AAC and evidence that its Common Stock traded in an efficient market during the Class Period.

### D.  *CAMMER* FACTOR 3: MARKET MAKERS

37.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[33] The third *Cammer* Factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[34]

38.    AAC Common Stock traded on the NYSE with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[35] On such over-the-counter markets, there may be a question as to liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the

---

[33] *See* http://www.sec.gov/answers/mktmaker.htm.

[34] *Cammer*, 711 F. Supp. at 1293.

[35] *See Cammer,* 711 F. Supp. At 1292, citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988): ("We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.").

16

NYSE, which are often assumed to be efficient,[36] report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[37]

39.     The NYSE is one of the largest and most liquid security exchanges in the world, with billions of shares traded each day. Unlike an over-the-counter market that relies on decentralized market makers providing liquidity for trading, the NYSE relies on a computerized system to match orders and provide quotes.[38] The minimum requirements to be listed on the NYSE and remain in good standing virtually guarantee a liquid market for the security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case. AAC meets the spirit of this factor, further supporting the efficiency of the market during the Class Period.

**E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY**

40.     The fourth *Cammer* Factor is SEC Form S-3 Eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[39]

---

[36] Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, §8.6 (Aug. 1988).

[37] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market. *See* http://nysemanual.nyse.com/lcm/Help/mapContent.asp?sec=lcm-sections&title=sx-ruling-nyse-policymanual_102.01&id=chp_1_2_2_1; William F. Sharpe, Gordon J. Alexander, Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 45-53; Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions,* Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[38] *See* https://www.nyse.com/market-model; https://www.nyse.com/market-model/dmm-case-studies; and https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf.

[39] *Cammer*, 711 F. Supp. at 1287.

41.     Through Form S-3, the SEC allows certain companies that have previously
provided sufficiently high levels of public information to incorporate prior SEC filings by
reference into current filings and not repeat the information, since it is already deemed to be
widely publicly available.[40] In order to be eligible to issue a Form S-3, among other things, a
company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for
more than one year, 2) must have filed all documents in a timely manner for the past twelve
months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted
on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency,
not a requirement.[41]  Interpreted in this way, the standard makes sense as an indicator of
efficiency.

42.     AAC filed a Form S-3 after the Class Period, on November 12, 2015, which was a
little over a year after their IPO when they became eligible per the criteria above. Therefore, this
factor affirmatively supports the conclusion that AAC Common Stock traded in an efficient
market.

## F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

43.     The fifth *Cammer* Factor relates to how the price of a security reacts to new
information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency
> would be to illustrate, over time, a cause and effect relationship between
> company disclosures and resulting movements in stock price.[42]

---

[40] For additional information, see www.sec.gov/about/forms/forms-3.pdf.

[41] *Cammer*, 711 F. Supp. at 1287.

[42] *Cammer,* 711 F. Supp. at 1291.

44.     Establishing a causal connection between new company-specific news events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called the "event study." An event study is a well-accepted statistical method used to isolate the impact of information on market prices.[43] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds, if not thousands, of academic articles as scientific evidence in evaluating how new information affects securities prices.[44]

45.     An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, news reports, or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

46.     To analyze cause and effect, I performed an event study to determine whether AAC Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no news. Based on the event study I performed, which explicitly controls for market factors, I find that there is a clear cause-and-effect relationship between new public information about AAC and the market return of AAC Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

---

[43] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997), p. 13.

[44] *See* John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998), p. 111.

47.     A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[45] I have performed such an analysis in this matter where I evaluate the relationship between AAC Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return Index (the "S&P 500" or the "Market Index") and the S&P United States BMI Healthcare Equipment and Services (Subsector) Index (the "Industry Index").[46]

48.     For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[47] By using a "rolling" estimation window of 120

---

[45] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent" variable). In this case, the daily percentage change in AAC Common Stock (the AAC daily "return") is the dependent variable and the contemporaneous daily returns for the S&P 500 and the S&P United States BMI Healthcare Equipment and Services (Subsector) Index are the independent variables. For a general discussion of regression analysis, see Chapters 1-3 in Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.

[46] As of the time of writing, AAC was a member of six S&P United States healthcare indices: *S&P United States SmallCap Health Care Equipment & Services (Subsector) Index*; *S&P United States BMI Growth Health Care (Sector) Index*; *S&P United States BMI Health Care (Sector) Index*; *S&P United States SmallCap Growth Health Care (Sector) Index*; *S&P United States BMI Health Care Equipment & Services (Subsector) Index*; and *S&P United States SmallCap Health Care (Sector) Index*. I selected the S&P *United States BMI Healthcare Equipment and Services (Subsector) Index* because it is a broad market index (i.e. BMI) and not specific to small cap, growth etc. In addition, it includes members I often found identified by analysts as peers (e.g. Acadia Health care and Universal Health Services). Furthermore, a robustness check of alternative indices suggested this index had the most explanatory power, and my conclusions are unaffected based on the choice of index.

I have subtracted the return of the S&P 500 from the return of the Industry Index. This is purely for ease of interpreting the results and has no effect on the abnormal returns.

[47] For the first 121 days of the Class Period, I constructed a fixed regression model as AAC had its IPO on the first day of the Class Period on October 2, 2014. By using a fixed model, the regression only looks at observations within this period. Rolling estimation was used for each trading day analyzed after the 121st trading day of the Class Period.

*See*, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Literature 13, 15 (1997) ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

trading days prior to the event of interest, it allows for the relationship between AAC Common Stock and the market as well as the firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[48]

49.    The model indicates that there is a positive correlation between AAC Common Stock, the S&P 500, and the Industry Index. In other words, the movement of the Market Index and Industry Index help explain movements in AAC stock price. For instance, choosing a day in the Class Period purely as an example, April 22, 2015, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.46, which means that a 1% rise in the S&P 500 predicts a 1.46% increase in AAC Common Stock return. The estimated coefficient for the Industry Index (less the S&P 500) is 1.62, which means that a 1% rise in the Industry Index beyond the movement in the S&P 500 predicts a 1.62% increase in AAC Common Stock Return. **Exhibit 5** plots the estimated coefficients for the rolling regression model for each day during the Class Period. **Exhibit 5** demonstrates there was a consistently positive relationship between the Market Index, the Industry Index, and AAC Common Stock price.

50.    Another important statistic from the regression is the Standard Deviation of the Errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much "randomness" remains in AAC Common Stock price movement after controlling for the Market Index and Industry Index. For instance, on the example date, April 22, 2015, the model predicted that absent any new firm-specific

---

[48] Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

information, the price of AAC Common Stock would increase by 0.29% because the S&P 500 was up 0.51% and the Industry Index was down -0.22% relative to the S&P 500.[49] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of 0.42%. Thus, the "abnormal return" for this day is 0.13% (the actual return of 0.42% minus the predicted return of 0.29%). I then rely on the Standard Deviation of the Errors from the regression model to tell if this abnormal return of 0.13% is sufficiently large that I reject random movement as the explanation.

51.     The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic", which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of 0.13% represents 0.04 standard deviations or a t-statistic of 0.04 (abnormal return of 0.13% divided by the Standard Deviation of the Errors of 0.03). Using the standard assumption that, in the absence of new firm-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should only have a t-statistic greater than 1.96 (or less than -1.96) 5% of the time.[50] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of 0.04, I would say that the abnormal return is not statistically significant at the 95% confidence level and I could not reject randomness as the

---

[49] The expected return of 0.29% is found as follows: 1.46 * (0.51%) (Coefficient on Market Index *times* Market Index return) + 1.62 * (-0.22%) (Coefficient on Industry Index *times* Industry Index return less the S&P 500) + (-0.09%) (constant term from regression).

[50] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001. The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

cause with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.[51]

52.  **Exhibit 6** shows that the Standard Deviation of the Errors varied over the Class Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility as depicted in **Exhibit 6**.

53.  To analyze cause-and-effect, I examined the price response of AAC Common Stock to earnings announcements that occurred during the Class Period, an objective set of dates (see **Exhibit 7**).

54.  There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that release of company earnings announcements often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[52] Also, newly released earnings reports by the company are an objective set of news to identify and test. As an example, AAC issued an earnings release after market close on February 24, 2015, in which they announced Q4 and Fiscal Year 2014 results that exceeded expectations

---

[51] Based on my regression model, 15 out of 209 days in the Class Period (7.18%) were statistically significant at the 95% confidence level.

[52] *See, e.g.*, William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968, pp. 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971, pp. 119-163; Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980, pp. 1-12.

"across the board."[53]  In response, the market price of AAC Common Stock increased 12.24% on February 25, 2015, compared to the predicted return of -0.60%. Thus, the abnormal return on February 25, 2015 was positive 12.83%. With a t-statistic of 3.77, this abnormal price movement is statistically significant, and I therefore have scientific evidence that AAC Common Stock reacted rapidly to this new information.

55.    Similar to this example, I analyzed the market reaction to AAC's other earnings announcements throughout the Class Period. In total, of the four quarterly earnings announcements AAC issued during the Class Period ("earnings announcement dates"), three resulted in statistically significant price movements above the 95% confidence level (two of which were significant at the 99% level).[54]

56.    **Exhibit 7** presents a summary of the earnings announcements and **Exhibits 8A – 8D** depict the intraday price movements for all of these announcement dates.

57.    I then compared these results against the 82 days during the Class Period on which there were no news articles,[55] no identified analyst reports, and no SEC filings issued ("days with no news"). Of these 82 days with no news, there were 6 statistically significant price movements. Thus, during the Class Period there was a statistically significant price reaction at the 95% level on 75% of the earnings announcement dates; on days with no news, I observed a statistically

---

[53] "Solid End to First Year as a Public Company; Development Pipeline Looks Robust," *William Blair*, February 24, 2015; "AAC: First Look at 4Q14," *Avondale Partners, LLC,* February 24, 2015.

[54] An abnormal return is significant at the 99% level if its t-statistic is less than -2.575 or greater than 2.575.

[55] News articles based on a Factiva search for articles from "All Sources" with the company field set to "AAC Holdings Inc (AACHO)" or articles containing the characters "AAC Holdings" for the period "October 2, 2014 – August 4, 2015." Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. There may be other news articles and sources that are not a part of Factiva's database, however, to the extent there are additional news stories not captured by Factiva, the treatment of those days as "no news days" would tend to bias toward finding a lack of cause and effect.

significant reaction 7.32% of the time.[56] The fact that I observed statistically significant movements on 7.32% of the days with no news is not statistically significantly different than what I would expect to observe by randomness alone.[57]

58.     Furthermore, on the 82 days with no news, the average change in AAC Common Stock price was 2.39% after controlling for the Market Index and Industry Index, while the average change in AAC Common Stock price on earnings announcement dates was 9.25%. In other words, the average magnitude of stock price movement on earnings announcement days was over 3 times higher than on days with no news.[58] Again, this demonstrates that on days when important firm-specific information is released to the market (namely, earnings announcements), the stock price moves much more than on days where there is no firm-specific news. This provides further evidence of a cause-and-effect relationship between firm-specific news and changes in AAC Common Stock price, and thus an efficient market.

59.     The bar charts below summarize this analysis, while **Exhibit 9** gives more detail.

---

[56] This difference between 75.00% and 7.32% is itself statistically significant at the 95% confidence level.

[57] By chance alone, 5% of dates would be significant when using a 95% confidence interval. 7.32% is not significantly different than 5% at the 95% confidence level.

[58] This difference between 2.39% and 9.25% is itself statistically significant.



**Percentage of Days Significant at the 95% Confidence Level**



**Average Absolute Abnormal Return**

60. Finally, when important firm-specific news is released to the market (e.g. earnings announcements), the daily trading volume also tends to be much higher than on days with no

26

news. For instance, the average daily trading volume of the 4 earnings announcement dates was 0.61 million shares. Compare this to the average daily trading volume of 0.14 million for days with no news.[59] The bar chart below summarizes this analysis.



61.    The bar charts above establish a strong cause-and-effect relationship between new, unexpected news and rapid changes in AAC Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news.

62.    In conclusion, the event study analysis and intraday charts presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of AAC Common Stock.

---

[59] The difference between 0.61 million and 0.14 million is significant at the 95% confidence level.

## G. ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

63.     Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[60] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

64.     AAC Common Stock had a higher market capitalization than close to half of NYSE and NASDAQ stocks combined during the Class Period, thus suggesting this factor is supportive of efficiency. There were between 20.67 million and 22.41 million shares of AAC Common Stock outstanding throughout the Class Period. AAC Holdings also had public float between 8.05 million and 14.10 million shares of common stock during the Class Period. [61]

65.     Based on the market price, the market capitalization for AAC Common Stock averaged $679.02 million during the Class Period. **Exhibit 10** shows AAC market capitalization over the Class Period. **Exhibit 11** shows that during the Class Period, AAC Common Stock's market capitalization fell between the 42nd and 49th percentile of firms on the NYSE and NASDAQ for the applicable quarters during the Class Period.[62] In other words, over the Class Period, AAC Common Stock had a higher market capitalization than at least 42% of the firms on the NYSE and NASDAQ. Therefore, this factor is supportive of market efficiency for AAC Common Stock.

---

[60] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105, 117 (2000).

[61] Source: S&P Capital IQ.

[62] Thomson Reuters and S&P Capital IQ.

## H. ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

66.    The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

67.    I analyzed bid-ask spreads for AAC Common Stock during the Class Period. **Exhibit 12A** shows that during the Class Period, the time-weighted average monthly percentage bid-ask spread ranged from 0.25% and 0.45%. This is well below the mean bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in February 2015 (the full month when AAC had the largest percentage bid-ask spread).[63] **Exhibit 12A** demonstrates that AAC Common stock had an average bid-ask spread of 0.45% in February 2015, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.89%.[64] **Exhibit 12B** shows that the time-weighted average dollar bid-ask spread for AAC was no more than $0.13 per share during the Class Period, while

_____

[63] The last month of the Class Period, August 2015, consisted of only one trading day in the Class Period; it has been incorporated into the average for the prior month, July 2015. Based on the full months contained within the Class Period, February 2015 had the largest bid ask spread percentage and thus is used for comparison. Quote data for AAC and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[64] The average bid-ask spread was calculated by taking a time-weighted average of the spread during trading hours on the primary exchange of each security. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

my randomly-selected group of 100 common stocks had an average bid-ask spread of $0.27.[65] Accordingly, AAC bid-ask spread was low during the Class Period in both dollar and percentage terms, thus this factor further supports market efficiency for AAC Common Stock.

### I. ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

68.    Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. Most institutions that hold over $100 million in assets are required to report their equity holdings on a quarterly basis on SEC Form 13F.[66] As **Exhibit 13** shows, these large institutions reported owning a majority of AAC Common Stock during the Class Period. For the quarters spanning the Class Period, 169 institutions owned AAC Common Stock, holding, on average, 89% of the public float. This high level of institutional ownership of AAC Common Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

### J. ADDITIONAL FACTOR 4: AUTOCORRELATION

69.    If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from

---

[65] Calculated as the average percentage bid-ask spread for this sample, scaled by $30.14, the average price of AAC in February 2015.

[66] See http://www.sec.gov/about/forms/form13f.pdf.

taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

70. Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[67]

71. A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[68] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

72. **Exhibit 14** displays the autocorrelation coefficient for AAC Common Stock using the abnormal returns from the event study model described above. The coefficient for the Class Period is very close to zero and not statistically significant, meaning there is no evidence of autocorrelation (*i.e.*, throughout the Class Period, the coefficient on the previous day's abnormal return averaged 0.03). This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that AAC Common Stock traded in an efficient market throughout the Class Period.

---

[67] Doron Avramov, et al., Liquidity and Autocorrelations in Individual Stock Returns, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, Some Anomalous Evidence Regarding Market Efficiency, 6 J. FIN. ECON. 95 (1978).

[68] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

## VIII. DAMAGES

73.    Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[69]

74.    The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I

---

[69] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

## IX. CONCLUSION

75. In sum, every factor analyzed supports my opinion that AAC Common Stock traded in an efficient market. Furthermore, class-wide damages in this matter can be calculated using a common methodology.

76. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 18, 2016

Chad Coffman

33

# Exhibit 1
## Summary of Efficiency Factors for AAC Holdings, Inc. (AAC)

| Factor | Summary of Factor | AAC Holdings, Inc. (AAC) |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | The average weekly trading volume of 4.19%, as a percentage of shares outstanding, well exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 177 thousand shares traded daily on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | During the Class Period at least 7 different securities analysts followed AAC Holdings, which implies that important information relevant to trading AAC Holdings common stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | Because AAC Holdings shares were exchange-traded on the NYSE during the class period, not over the counter, this factor is satisfied. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | AAC Holdings met the important eligibility criteria for SEC Form S-3 and was eligible to file a Form S-3 Registration Statement with the SEC once they met the criteria for having filed SEC submissions for one year following their IPO. Indeed, AAC Holdings filed a Form S-3 on November 12, 2015, shortly after they became eligible. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for AAC Holdings Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | During the Class Period, AAC Holdings common stock market capitalization ranged from $374 million to $977 million, which is at or above the 42nd percentile of NYSE and NASDAQ stocks. AAC Holdings Common Stock therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | During the Class Period, the bid-ask spread for AAC Holdings Common Stock in each month ranged from 0.25% to 0.45%. AAC's average percentage bid-ask spread was well below the mean bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in February 2015 (the full month when AAC had the largest bid ask spread). This supports a finding of efficiency. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | 169 institutions held 89% of the public float throughout the class period, on average, which further supports the finding that AAC Holdings Common Stock traded in an efficient market. (Note: Institutions held as much as 93% of the public float during the Class Period). |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | No evidence of autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading AAC Holdings Common Stock based solely on its past price movements. |



**Exhibit 2**
**AAC Holdings, Inc. Common Stock Price and Volume**
**10/2/2014 - 9/30/2015**

Class Period: 10/2/14 - 8/3/15

Source: Capital IQ
Note: NYSE Listed

# Exhibit 3
## AAC Holdings, Inc. Common Stock Average Weekly Trading Volume
## as a Percentage of Shares Outstanding
## 10/3/2014 - 8/3/2015



**AAC Weekly Volume as Percentage of Shares Outstanding:**
Average: 4.19%
Median: 3.27%

"2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one" (*Cammer*)

"1% average weekly trading volume of the outstanding shares justify a substantial presumption" (*Cammer*)

■ Volume as a Percentage of Shares Outstanding

Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the second day of the Class Period on 10/3/2014 through 8/3/2015. The first day of the Class Period is an Initial Public Offering date where 2.8 million shares traded, and was excluded from the analysis. The last trading week of the Class Period consists of four trading days only, 7/29/2015, 7/30/2015, 7/31/2015 and 8/3/2015.

# Exhibit 4
## Summary of Securities Analyst Reports Issued
## for AAC Holdings, Inc. During the Class Period
## 10/2/2014 - 8/3/2015

|  | Analyst Name | Number of Reports Issued |
|---|---|---|
| [1] | Avondale Partners | 15 |
| [2] | William Blair | 9 |
| [3] | ValueEngine | 5 |
| [4] | Wright Investors' Service | 4 |
| [5] | Validea | 2 |
| [6] | Soundview Technology | 1 |
| [7] | Raymond James & Associates | - |
| | **Total** | **36** |

Source:

Investext and Counsel.

"FQ3 2014 Earnings Call Transcripts," S&P Capital IQ, November 6, 2014.

"FQ4 Earnings Call Transcripts," S&P Capital IQ, February 25, 2015.

"FQ1 2015 Earnings Call Transcripts," S&P Capital IQ, April 30, 2015.

"FQ2 2015 Earnings Call Transcripts," S&P Capital IQ, July 29, 2015.

Note: Many analyst reports are not available through third party data providers (e.g. Investext); therefore, this almost certainly understates the total amount of analyst coverage. I was not able to obtain Raymond James & Associates reports from my third party data provider. However, Raymond James & Associates participated in AAC Holdings' Earnings Conference Calls during the Class Period and therefore were following the Company.



**Exhibit 5**
**Coefficients from Event Study Regression for AAC Holdings, Inc.**
**3/27/2015 - 8/3/2015**

— S&P 500 Total Return Index          — S&P US BMI Health Care Equipment & Services (Subsector) Index

Source: Capital IQ
The event study relies on a fixed regression for the first 121 trading days in the Class Period since AAC had its IPO on the first day of the Class Period. Starting on the 122nd trading day in the Class Period (i.e. 3/27/2015), I employ a 120 day rolling regression. The regression model controls for the S&P 500 Total Return Index and an Industry Index (S&P US BMI Health Care Equipment & Services (Subsector) Index). The returns of the Industry Index are net of the S&P 500. Earnings announcements and the alleged corrective disclosure dates have been removed from the estimation. In addition, 11/7/2014, the second market date following the after-hours earnings announcement on 11/5/2014, has also been removed due to continued significant price reaction.



**Exhibit 6**
**Standard Deviation of the Errors**
**from Rolling Event Study Regressions for AAC Holdings, Inc.**
**3/27/2015 - 8/3/2015**

Source: CapIQ

The event study relies on a fixed regression for the first 121 trading days in the Class Period since AAC had its IPO on the first day of the Class Period. Starting on the 122nd trading day in the Class Period (i.e. 3/27/2015), I employ a 120 day rolling regression. The regression model controls for the S&P 500 Total Return Index and an Industry Index (S&P US BMI Health Care Equipment & Services (Subsector) Index). The returns of the Industry Index are net of the S&P 500. Earnings announcements and the alleged corrective disclosure dates have been removed from the estimation. In addition, 11/7/2014, the second market date following the after-hours earnings announcement on 11/5/2014, has also been removed due to continued significant price reaction.

**Exhibit 7**
**Event Study Analysis of AAC Holdings, Inc's Earnings Dates**

| # | Date | Time | Day of Week | Market Date | Event | Headline | AAC Price | AAC Raw Return | Abnormal Return | Abnormal Dollar Change | T-Stat | P-Value | Sig Level[2] |
|---|------|------|-------------|-------------|-------|----------|-----------|----------------|-----------------|------------------------|--------|---------|--------------|
| | | | | | | | | | Rolling Regression Model (120-day rolling window)[1] | | | |
| 1 | 11/5/2014 | 5:18 PM | Wed | 11/6/2014 | Earnings Release | AAC Holdings, Inc. Reports Third Quarter 2014 Results *(Business Wire)* | $23.35 | 8.10% | 7.51% | $1.62 | 2.21 | 0.03 | ** |
| 2 | 2/24/2015 | 4:05 PM | Tue | 2/25/2015 | Earnings Release | AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2014 Results *(Business Wire)* | $37.33 | 12.24% | 12.83% | $4.27 | 3.77 | 0.00 | *** |
| 3 | 4/29/2015 | 4:05 PM | Wed | 4/30/2015 | Earnings Release | AAC Holdings, Inc. Reports First Quarter 2015 Results *(Business Wire)* | $34.66 | 10.70% | 12.99% | $4.07 | 4.00 | 0.00 | *** |
| 4 | 7/29/2015 | 4:54 PM | Wed | 7/30/2015 | Earnings Release | AAC Holdings, Inc. Reports Second Quarter 2015 Results *(Business Wire)* | $37.49 | -4.04% | -3.67% | -$1.43 | -1.16 | 0.25 | |

Source: S&P Capital IQ; AAC Holdings, Inc. Press Releases.
Notes:
(1) The event study relies on a fixed regression for the first 121 trading days in the Class Period since AAC had its IPO on the first day of the Class Period. Starting on the 122nd trading day in the Class Period (i.e. 3/27/2015), I employ a 120 day rolling regression. The regression model controls for the S&P 500 Total Return Index and an Industry Index (S&P US BMI Health Care Equipment & Services (Subsector) Index). The returns of the Industry Index are net of the S&P 500. Earnings announcements and the alleged corrective disclosure dates have been removed from the estimation. In addition, 11/7/2014, the second market date following the after-hours earnings announcement on 11/5/2014, has also been removed due to continued significant price reaction.
(2) "***" Denotes statistical significance at the 99% confidence level or greater, "**" denotes statistical significance at the 95% confidence level or greater, and "*" denotes statistical significance at the 90% confidence level or greater.

# Exhibit 8A
## AAC Holdings, Inc. Intraday Price and Volume
### 11/6/2014



| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| 8.10%  | 7.51%       | 2.21   |

11/5/2014
4:00 pm - $21.60
**NYSE Close**

11/6/2014
4:00 pm - $23.35
**NYSE Close**

11/5/2014 5:18 pm
AAC announces
Q3 2014 Results

11/6/2014
10:00 AM - $22.51
AAC Q3 2014 Earnings
Conference Call

11/6/2014
9:32 am - $21.50
**NYSE Open**
(first trade at 9:32am)

Source: TICK Data.

Case 3:15-cv-00923   Document 80-4   Filed 10/18/16   Page 41 of 63 PageID #: 2802

# Exhibit 8B
## AAC Holdings, Inc. Intraday Price and Volume
### 2/25/2015



2/24/2015
4:00 pm - $33.26
**NYSE Close**

2/24/2015 4:05 pm
AAC announces
Q4 2014 Results

2/25/2015
9:30 am - $33.75
**NYSE Open**

| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| 12.24% | 12.83% | 3.77 |

2/25/2015
4:00 pm - $37.33
**NYSE Close**

2/25/2015
11:00 AM - $34.85
AAC Q4 2014 Earnings
Conference Call

Source: TICK Data.

Case 3:15-cv-00923   Document 80-4   Filed 10/18/16   Page 42 of 63 PageID #: 2803



# Exhibit 8C
## AAC Holdings, Inc. Intraday Price and Volume
### 4/30/2015

| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| 10.70% | 12.99% | 4.00 |

**4/29/2015**
3:59 pm - $31.31
**NYSE Close**

**4/29/2015 4:05 pm**
AAC announces
Q1 2015 Results

**4/30/2015**
9:30 am - $34.68
**NYSE Open**

**4/30/2015**
11:00 AM - $35.06
AAC Q1 2015 Earnings
Conference Call

**4/30/2015**
4:00 pm - $34.66
**NYSE Close**

Source: TICK Data.

**Exhibit 8D**
**AAC Holdings, Inc. Intraday Price and Volume**
**7/30/2015**

Source: TICK Data.



**Exhibit 9**
**Comparison of Statistical Significance and Abnormal Returns**
**for AAC Holdings Earnings Announcement Dates**
**vs. Days with No News**

| Statistic | Earnings Announcement Dates | Days with No News, No Analyst Reports, and No SEC Filings |
|---|---|---|
| N | 4 | 82 |
| Significant Days at 95% Confidence Level | 3 | 6 |
| % Significant Days at 95% Confidence Level[1] | 75.00% | 7.32%[2] |
| Average Absolute Abnormal Return[3],[4] | 9.25% | 2.39% |

Notes:

(1) 75% rate of statistical significance is statistically significantly different than 7.32% at the 95% confidence level.

(2) One would expect to observe 5% based on random chance alone. 7.32% is not statistically significantly different than 5% based on results of a t-test at the 95% confidence level.

(3) The event study relies on a fixed regression for the first 121 trading days in the Class Period since AAC had its IPO on the first day of the Class Period. Starting on the 122nd trading day in the Class Period (i.e. 3/27/2015), I employ a 120 day rolling regression. The regression model controls for the S&P 500 Total Return Index and an Industry Index (S&P US BMI Health Care Equipment & Services (Subsector) Index). The returns of the Industry Index are net of the S&P 500. Earnings announcements and the alleged corrective disclosure dates have been removed from the estimation. In addition, 11/7/2014, the second market date following the after-hours earnings announcement on 11/5/2014, has also been removed due to continued significant price reaction.

(4) An average absolute abnormal return of 9.25% is statistically significantly different than 2.39% based on a t-test for difference of means at the 95% confidence level.



**Exhibit 10**
**AAC Holdings, Inc. Common Stock Market Capitalization**
**10/2/2014 - 9/30/2015**

Class Period: 10/2/14 - 8/3/15

Market Capitalization (millions)

Source: Capital IQ
Note: NYSE Listed

■ Market Capitalization

**Exhibit 11**
**AAC Holdings, Inc. Common Stock Market**
**Capitalization Compared to Companies Traded on**
**the NYSE & the NASDAQ**

| Last trading day of: | AAC Market Capitalization (millions) | Percentile Rank in NYSE and NASDAQ |
|---|---|---|
| Q4 2014 | $651.82 | 43.72% |
| Q1 2015 | $666.25 | 43.84% |
| Q2 2015 | $951.35 | 49.38% |
| Q3 2015 | $498.61 | 42.19% |

Source: S&P Capital IQ and Thomson Reuters Eikon.



# Exhibit 12A
## AAC Holdings, Inc. Common Stock
## Average Monthly Bid-Ask Percentage Spread per Share
## 10/2/2014 - 8/3/2015

Mean Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE & the NASDAQ in February 2015: 0.89%

Median Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE & the NASDAQ in February 2015: 0.20%

Source: TICK Data.
Note: August 2015 has only one trading day during the class period; it has been incorporated into the average for July 2015.



# Exhibit 12B
## AAC Holdings, Inc.Common Stock
## Average Monthly Bid-Ask Dollar Spread per Share
## 10/2/2014 - 8/3/2015

Mean Dollar Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE & the NASDAQ in February 2015: $0.27

Median Dollar Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE & the NASDAQ in February 2015: $0.06

*Dollar Spread per share* (y-axis): $0.00, $0.05, $0.10, $0.15, $0.20, $0.25, $0.30

(x-axis): Oct 2014, Nov 2014, Dec 2014, Jan 2015, Feb 2015, Mar 2015, Apr 2015, May 2015, Jun 2015, Jul 2015

Source: TICK Data.
Notes: - August 2015 has only one trading day during the class period; it has been incorporated into the average for July 2015.
- The average and median dollar bid-ask spread for the randomly-selected sample of 100 common stocks trading on the NYSE & the NASDAQ in February 2015 are given by the average and median percentage bid-ask spread for this sample, scaled by $30.14 (the average AAC trading price in February 2015).

Case 3:15-cv-00923  Document 80-4  Filed 10/18/16  Page 49 of 63 PageID #: 2810

**Exhibit 13**

**AAC Holdings, Inc. Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Last Trading Day of: | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| Q4 2014 | 21,081 | 78 | 13,497 | 464 | 8,047 | 64.02% | 6,775 | 32.14% | 84.19% |
| Q1 2015 | 21,787 | 96 | 13,747 | 1,273 | 9,313 | 63.10% | 8,308 | 38.13% | 89.21% |
| Q2 2015 | 21,840 | 122 | 13,718 | 2,741 | 10,863 | 62.81% | 9,596 | 43.94% | 88.34% |
| Q3 2015 | 22,409 | 104 | 13,751 | 5,440 | 14,098 | 61.36% | 13,042 | 58.20% | 92.51% |

| Total Institutions over Class Period: | 169 | | | | Average: | 62.82% | | 43.10% | 88.56% |
|---|---|---|---|---|---|---|---|---|---|

Sources: S&P Capital IQ and SEC filings.

## Exhibit 14
## AAC Holdings, Inc. Common Stock
## Test for Autocorrelation During the Class Period

| Quarter | Coefficient on Previous Day Abnormal Return [1] | T-statistic |
|---|---|---|
| Q4 2014 | -0.09 | -0.68 |
| Q1 2015 | 0.20 | 1.47 |
| Q2 2015 | -0.03 | -0.24 |
| Q3 2015 | -0.25 | -1.10 |
| **Class Period** | **0.03** | **0.40** |

Source: S&P Capital IQ.

Note: The estimation period runs from 10/4/2014 - 8/3/2015.

(1) For each month I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements and the alleged corrective disclosure dates have been removed from the estimation. In addition, 11/7/2014, second market date following the earnings announcement on 11/5/2014, has also been removed due to continued significant price reaction.

# Appendix A
# Documents Considered

**Court Documents**

- Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *Dr. Joseph F. Kasper, v. AAC Holdings, Inc.*, dated February 29, 2016.

**Court Decisions and Securities Law**

- *Basic, Inc. v. Levinson*, 485 U.S. (1988).
- Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. (2014).
- *Krogman v. Sterritt* 202 F.R.D. (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

**SEC Filings/Forms**

- AAC Holdings, Inc. 10-K Annual filings submitted to the SEC applicable Class Period:
    - AAC Holdings, Inc., 10-K for the Fiscal Year End December 31, 2014.
    - AAC Holdings, Inc., 10-K for the Fiscal Year End December 31, 2015.
- AAC Holdings, Inc. Form 424(B)(4) filed with the SEC on October 2, 2014.
- AAC Holdings, Inc. Form S-3 filed with the SEC on November 12, 2015.
- AAC Holdings, Inc. 10-Q Quarterly filings submitted to the SEC during the Class Period.
- AAC Holdings, Inc. 8-K Current reports submitted to the SEC during the Class Period.
- Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.

**Security Data**

- Historical data for AAC Holdings, Inc. Common Stock, S&P United States BMI Healthcare Equipment and Services (Subsector) Index and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- Trade and quote data for AAC Holdings, Inc. during the Class Period and one hundred random companies trading on the New York Stock Exchange and NASDAQ for February 2015 were obtained from Tick Data, *see* https://tickapi.tickdata.com/.
- Institutional and Insider holdings data was obtained from S&P Capital IQ.
- AAC Holdings, Inc. stock options data were obtained from IVolatility, *see* http://www.ivolatility.com.
- Turnover velocity data for NYSE was obtained from the World Federation of Exchanges, *see* http://www.world-exchanges.org/home/.

**AAC Holdings, Inc. News**

- AAC Holdings, Inc. news headlines and select articles downloaded from Factiva for the Class Period.
    - News was obtained by executing a search via Factiva for "All Sources" with the company field "AAC Holdings Inc (AACHO)" or all articles containing the characters "AAC Holdings", for the period "October 2, 2014 – August 4, 2015." The Factiva search yielded 265 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- AAC Holdings, Inc. earnings conference call transcripts during the Class Period.
- AAC Holdings, Inc. earnings press releases throughout the Class Period:
    - "AAC Holdings, Inc. Reports Third Quarter 2014 Results," *Business Wire,* November 5, 2014.
    - "AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2014 Results," *Business Wire,* February 24, 2014.
    - "AAC Holdings, Inc. Reports First Quarter 2015 Results," *Business Wire,* April 29, 2015.
    - "AAC Holdings, Inc. Reports Second Quarter 2015 Results," *Business Wire,* July 29, 2015.

**AAC Holdings, Inc. Analyst Reports**

- AAC Holdings, Inc. analyst reports supplied by Investext via Thomson Reuters and from Lead Plaintiffs' Counsel for the period October 2014 to December 2015, including, but not limited to:
    - "Solid End to First Year as a Public Company; Development Pipeline Looks Robust," *William Blair,* February 24, 2015.
    - "AAC: First Look at 4Q14," *Avondale Partners, LLC,* February 24, 2015.

**Academic Articles/Texts**

- Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. (1970).
- William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995
- Yakov Amihud, et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. (2005).
- Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. (2000).
- Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).

- John Binder, *The Event Study Methodology Since 1969*, 11 Rᴇᴠ. Qᴜᴀɴᴛɪᴛᴀᴛɪᴠᴇ Fɪɴ. & Aᴄᴄᴛ. (1998).
- Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. Fɪɴ. (1995).
- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. Fɪɴ. Eᴄᴏɴ. (1996).
- William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Doron Avramov, et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. Fɪɴ. (2006).
- Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. Fɪɴ. Eᴄᴏɴ. (1978).

**<u>Other</u>**

- http://www.world-exchanges.org/home/.
- http://www.sec.gov/answers/mktmaker.htm
- http://nysemanual.nyse.com/lcm/Help/mapContent.asp?sec=lcm-sections&title=sx-ruling-nyse-policymanual_102.01&id=chp_1_2_2_1.
- https://www.nyse.com/market-model.
- https://www.nyse.com/market-model/dmm-case-studies.
- https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf.
- http://www.sec.gov/edgar/searchedgar/companysearch.html
- http://www.sec.gov/about/forms/form13f.pdf/
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.html

## CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:         (312) 470-6500
Mobile:        (815) 382-0092
Email:         ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats. MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997

Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.** Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing: Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

   o In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation. Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
   o In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
   o In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
   o In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
   o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares. Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory. Filed expert report April 30, 2010. Filed rebuttal expert report August 4, 2010. Filed declaration re: Plan of Allocation September 25, 2009**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009. Filed rebuttal expert report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009. Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>. Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report on January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et. al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed rebuttal expert report July 8, 2010. Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>. Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>. Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20,

2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed rebuttal expert report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed rebuttal expert report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed rebuttal expert report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed rebuttal expert report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed rebuttal expert report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert report May 13, 2016. Deposition June 10, 2016.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed rebuttal expert report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015. Filed rebuttal expert report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed rebuttal expert report December 7, 2015.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed rebuttal expert report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed rebuttal expert report February 2, 2016. Filed expert reply report on March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016.


<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u> – Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>. Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation. Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994 Ford Fellowship Recipient for Summer Research.
1993 Arnold Prize for Best Research Proposal.
1995 Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.